#23520-rev & rem-JKK
**2006 SD 6**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ZIEGLER FURNITURE AND
FUNERAL HOME, INC.                                        Plaintiff and Appellant,

v.

BILL CICMANEC,                                            Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
* * * *

HONORABLE THOMAS L. TRIMBLE
Judge

* * * *

ROBERT GUSINSKY of
Lynn, Jackson, Shultz &
 Lebrun                                                   Attorneys for plaintiff
Rapid City, South Dakota                                 and appellant.

ROBERT M. NASH of
Wilson, Olson & Nash                                     Attorneys for defendant
Rapid City, South Dakota                                and appellee.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 30, 2005

OPINION FILED **01/18/06**

#23520

KONENKAMP, Justice

[¶1.]       In this breach of contract action, we are asked to decide, among other things, whether the parties formed an enforceable purchase agreement. After a trial, the circuit court ruled that only an option contract was formed and that it was unenforceable. Although it was labeled as an option contract, it had all the elements of a purchase agreement, and the parties treated it as a purchase agreement. Therefore, we reverse and remand.

## Background

[¶2.]       Since its founding, Ziegler Furniture and Funeral Home, Inc. has been the only funeral home serving Martin, South Dakota and the surrounding communities. Raymond Ziegler started the business in the 1950s, and in 1976, he handed the operation over to his son, Rick Ziegler. In 2001, Rick Ziegler sought to sell the business because he was dying of lung cancer.

[¶3.]       Before Rick's death, his daughter, Amber Ziegler, assisted with the attempted sale of the family business. In her effort to secure a purchaser, Amber Ziegler sent an information packet to Daryl Isburg. A funeral director for nearly thirty-five years, Isburg owns an interest in numerous funeral homes, including one in Pierre, South Dakota. Isburg expressed interest. However, he wanted a partner to join in this business venture, a person located closer to Martin and respected by that community. He contacted Bill Cicmanec about the possibility of purchasing the Ziegler Funeral Home as a partnership.

[¶4.]       On August 27, 2001, after conferring about the purchase, Isburg and Cicmanec visited Ziegler Funeral Home and met with Amber Ziegler to negotiate a

deal on the business. During their visit, Amber Ziegler showed Isburg and Cicmanec the facilities and inventory. Following the tour and several hours of negotiations, Amber Ziegler, Isburg, and Cicmanec signed a document entitled "Opption [sic] to Purchase" drafted by Isburg.

[¶5.]    The contract recited a purchase price of $170,000, with a down payment of $40,000. The purchase price clause stated that the "[b]reak down of purchase price will be stipulated in the original purchase agreement that is agreeable to both parties" and that a "cash deal must be negotiated as a discount for cash." Paragraph five, entitled "Due Diligence," provided:

> This Agreement and Closing is subject to due diligence to be conducted by Buyer. The due diligence shall include, but is not limited to, review of the most recent five (5) years of Corporation's financial statements, tax returns, and individual funeral contracts, and inspection of the Acquired Property and the Funeral Home Parcel. Buyer may withdraw from this Agreement at any time after competing [sic] the due diligence, but prior to Closing, by giving written notice to Seller. In the event of Buyer's withdrawal, the parties hereto shall have no further rights or obligations under this Agreement, the parties shall pay their own respective costs incurred and shall owe no reimbursement or damages to the other party.

[¶6.]    According to paragraph six, the scheduled closing date was to "take place after October 1, 2001 or such other time after as the parties hereto may mutually agree upon. . . . At Closing, Buyer shall provide a more formal purchase agreement at buyer's cost to prepare and seller's cost to review." If the parties sought to amend any portion of their agreement, they were required to enter into a subsequent signed writing. Isburg inserted at the bottom of the agreement his handwritten notation: "Earnest money – $500 – 90 days to execute purchase." At the bottom of the contract, Amber Ziegler signed on behalf of Ziegler Funeral Home;

Isburg and Cicmanec signed in their individual capacities. After the signing, Amber Ziegler ended her search for other buyers.

[¶7.]      Rick Ziegler died on September 2, 2001. Amber Ziegler and the buyers proceeded with the agreement to sell the funeral home. Shortly, though, Cicmanec's partners said that they wanted to participate in the purchase of the Ziegler Funeral Home, but without Isburg's involvement. Cicmanec asked Isburg to relinquish his association with the purchase. Isburg agreed. Cicmanec then continued with the agreement.

[¶8.]      On September 19, 2001, the parties met. Besides Amber Ziegler and Cicmanec, also in attendance were Herb Hobson, the personal representative of Rick Ziegler's estate; Attorney Fred Cozad, the estate's counsel; and Jim Gardner, the accountant for the estate. Everyone indicated that they wanted to proceed with the sale.

[¶9.]      After the conference, Cozad began preparing the formal contract as contemplated in paragraph six of the original agreement. On October 4, 2001, he forwarded the newly drafted agreement to George Watson, an attorney who represented the buyers. In response to the proposed contract, Watson stated that the agreement was "in pretty good form" and commented on a few provisions concerning the allocation of the purchase price between personal and real property, prepaid funeral accounts, a notice of the upcoming installment sale, and the formation of a limited liability company. Thereafter, Cozad made some further adjustments to the parties' agreement.

[¶10.] Meanwhile, from the time Cicmanec entered into the agreement to buy the funeral home in September 2001, and in anticipation of his purchase of the funeral home, Cicmanec became the new funeral director for the Ziegler Funeral Home. As part of his introduction to the Martin community, an advertisement in the local newspaper was taken out to promote the funeral home and Cicmanec's position as the town's new funeral director.

[¶11.] During the next five months, the parties sought to consummate the sale of the funeral home. Numerous attempts were made by Ziegler Funeral Home to close the deal with the purchasers. On April 12, 2002, however, Cicmanec informed Amber Ziegler that the purchase of the funeral home could not go forward because he and his partners could not obtain financing. Nothing in the agreement suggested any financing contingency, however.

[¶12.] Efforts continued to resolve the issue, but the sale never closed. Finally, on September 26, 2002, Amber Ziegler notified Cicmanec that his position as director was terminated. At the same time, she purchased the funeral home from her father's estate and told Cicmanec that the funeral home was no longer for sale. Shortly after being released as the director for Ziegler Funeral Home, Cicmanec and his partners opened a competing funeral home in Martin: Bennett County Funeral Service, Inc. Cicmanec became the new funeral home's director.

[¶13.] On November 27, 2002, Ziegler Funeral Home brought suit alleging, among other things, that Cicmanec breached the purchase agreement executed on August 27, 2001. After a one-day trial to the court, the judge ruled in Cicmanec's favor. Ziegler Funeral Home now appeals, raising the following issues: (1) Did the

trial court err when it found that the agreement between the parties constituted an option?; (2) Did the trial court err when it found that the August 27 agreement was modified by Isburg no longer being involved?; (3) Did the trial court err when it failed to find damages?

## Standard of Review

[¶14.]	Contract interpretation is a question of law reviewable de novo. Schulte v. Progressive Northern Ins. Co., 2005 SD 75, ¶5, 699 NW2d 437, 438 (citation omitted). "'Because we can review the contract as easily as the trial court, there is no presumption in favor of the trial court's determination.'" Cowan v. Mervin Mewes, Inc., 1996 SD 40, ¶6, 546 NW2d 104, 107 (quoting Commercial Trust & Sav. Bank v. Christensen, 535 NW2d 853, 856 (SD 1995)). "When the meaning of contractual language is plain and unambiguous, construction is not necessary. If a contract is found to be ambiguous the rules of construction apply." Pesicka v. Pesicka, 2000 SD 137, ¶6, 618 NW2d 725, 726 (citing Alverson v. Northwestern Nat'l Cas. Co., 1997 SD 9, ¶8, 559 NW2d 234, 235). "'Whether the language of a contract is ambiguous is . . . a question of law.'" *Id.* (quoting Enchanted World Doll Museum v. Buskohl, 398 NW2d 149, 151 (SD 1986)). We review a circuit court's decision regarding an equitable remedy under the abuse of discretion standard. Adrian v. McKinnie, 2002 SD 10, ¶9, 639 NW2d 529, 533.

## Analysis and Decision

### 1. Option Contract or Purchase Agreement

[¶15.]	In its conclusions of law, the circuit court ruled that the document the parties signed was "an option, not a purchase agreement and had consideration to

support it." Ziegler Funeral Home maintains that the agreement "constituted a bona fide purchase agreement rather than an option" contract. An option, as Ziegler Funeral Home argues, "requires separate consideration to be enforceable." Ziegler Funeral Home contends that the undisputed testimony at trial sets forth that "the $500 earnest money deposit was not payment for an option but rather went toward the purchase price. . . ." Ziegler Funeral Home also asserts that the plain, unambiguous language of the parties' agreement cannot be read to form an option agreement. Instead, according to Ziegler Funeral Home, the agreement demonstrates a clear intent to purchase the funeral home.

[¶16.]		In our de novo review of this contract, we adhere to well-settled precepts of contract interpretation. "We must first determine whether the provision is ambiguous." *Pesicka*, 2000 SD 137, ¶8, 618 NW2d at 727. "A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct." *Alverson*, 1997 SD 9, ¶8, 559 NW2d at 235 (quoting City of Watertown v. Dakota, Minnesota & E. R.R. Co., 1996 SD 82, ¶ 13, 551 NW2d 571, 574) (additional citations omitted). In determining the question of ambiguity,

> [a] contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract. Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.

*Pesicka*, 2000 SD 137, ¶10, 618 NW2d at 727 (quoting Singpiel v. Morris, 1998 SD 86, ¶16, 582 NW2d 715, 719). Moreover, the proper interpretation of a contract must give effect to the intention of the contracting parties. *Singpiel*, 1998 SD 86,

¶10, 582 NW2d at 718. This Court need only look to the language that the parties used in the contract to determine their intention. *Id.* "'If that intention is clearly manifested by the language of the [agreement], it is the duty of this [C]ourt to declare and enforce it.'" *In re* Estate of Stevenson, 2000 SD 24, ¶14, 605 NW2d 818, 821 (citing Rowett v. McFarland, 394 NW2d 298, 301 (SD 1986) (citation omitted)).

[¶17.]     In this case, the crux of the issue is determining whether the parties entered into an option contract or a bona fide bilateral agreement for the sale of real property. "An option to purchase real property may be defined as a contract by which an owner of real property agrees with another person that the latter shall have the privilege of buying the property at a specified price within a specified time, or within a reasonable time. . . ." Kuhfeld v. Kuhfeld, 292 NW2d 312, 314 (SD 1980) (citations omitted). Such an agreement "imposes no obligation to purchase upon the person to whom it is given." *Id.* (citations omitted).

[¶18.]     Here, the agreement the parties signed stipulated that the Ziegler Funeral Home would sell "all of the assets used in the operation" of the business, and "the land and building used as the Ziegler Funeral Home. . . ." The parties agreed on a purchase price of $170,000, a down payment of $40,000, and an amount carried over by Ziegler Funeral Home of $130,000 at an interest rate of six percent. In paragraph five, the purchasers were required to perform due diligence prior to closing. The closing date was scheduled to take place after October 1, 2001, at which time the buyer was required to "provide a more formal purchase agreement. . . ."

[¶19.]     All additional terms of the contract were drafted in contemplation of a sale and purchase of the Ziegler Funeral Home.  Thus, the agreement had a provision that the purchasers disclaimed any liability that may run with the property when the transaction was concluded, a clause for arbitration in anticipation of a dispute, and a provision requiring the parties to split the cost of title insurance.  No language creating an option to purchase can be found in this agreement.  Rather, the seller agreed to sell and the buyers agreed to buy under the terms of the contract.

[¶20.]     After a careful review of the entire contract, we conclude that this was an unambiguous purchase agreement.  It stated, "Earnest money – $500 – 90 days to execute *purchase*." (Emphasis added).  Even the circuit court in its findings of fact characterized the $500 paid as "earnest money."  If an option contract was intended, the language of the agreement should have stated "90 days to execute [or exercise] *option*." (Emphasis added).  Although Isburg entitled the document "opption [sic] to purchase," the title is not dispositive.  *See* Allen v. Smith, 114 CalRptr2d 898, 904 (CalCtApp 2002).  In fact, paragraph eight of the agreement explicitly stated that "captions are for reference purposes only, and are not to be used to interpret the terms of this Agreement."

[¶21.]     No conditional terms were included in the contract either, such as a provision making the contract contingent on the buyers' acquisition of financing.  At trial, Isburg explained that the "90 days to execute purchase" phrase was intended to give the purchasers enough time to complete their due diligence.  "Due diligence" is defined as "[t]he diligence reasonably expected from, and ordinarily exercised by,

a person who seeks to satisfy a legal requirement or to *discharge an obligation*."

Black's Law Dictionary 468 (7th ed 1999) (emphasis added). Since the purchasers were obligated to conduct due diligence before closing, and since the purchasers' intent was to buy Ziegler Funeral Home, the August 27 agreement was clearly a purchase contract.

[¶22.] Other terms in the agreement also lead to the conclusion that this was a purchase agreement: "earnest money" is defined as "[a] deposit paid . . . by a prospective buyer . . . to show a *good-faith intention to complete the transaction. . . .*" *Id.* at 525-26 (emphasis added). The relevant definition of a "deposit" is "[m]oney placed with a person as earnest money or security for the *performance of a contract.*" *Id.* at 450 (emphasis added). Similarly, "down payment" is defined as "[t]he portion of a purchase price paid in cash (or its equivalent) at the time the sale agreement is executed." *Id.* at 1150.

[¶23.] Despite the unambiguous language of this agreement, Cicmanec contends that it was merely an option to purchase at a future date. The earnest money, Cicmanec asserts, was consideration for the option, not for the purchase of the funeral home. Moreover, because the terms of the August 27 agreement were not specific, Cicmanec argues that the agreement simply contemplated that a more formal contract would follow at a later time; thus, the uncertainty of the terms transformed the agreement into an option contract.

[¶24.] In determining whether an "option is separately enforceable, we look to whether the total consideration can be apportioned to correspond with separate consideration offered by the other party in exchange for the option." *Cowan*, 1996

SD 40, ¶6, 546 NW2d at 107 (citing Crowley v. Texaco, Inc., 306 NW2d 871, 874 (SD 1981)). In this case, the purported option was not supported by separate consideration. The "earnest money" was intended as a deposit, as shown in the parties' contract and the testimony in the court trial. "A legitimate option ordinarily consists of an agreement to grant an irrevocable right to purchase for independent consideration, and a separate purchase and sale agreement attached as an exhibit thereto." *Allen*, 114 CalRptr2d at 905 (citing Torlai v. Lee, 76 CalRptr 239, 241-42 (CalCtApp 1969)).

[¶25.] As to Cicmanec's assertion that "more specific terms" were required, buyers may make subsequent proposals to a contract to refine nonessential terms of the deal without jeopardizing their rights under the agreement. *See* Ackerman v. Carpenter, 29 A2d 922, 925 (Vt 1943). Even if we were to find ambiguity in the contract, "one who speaks or writes a contract can by exactness of expression more easily prevent mistakes in meaning than one with whom he is dealing[;] therefore any doubts arising from ambiguity of language are resolved in favor of the latter." *Enchanted World Doll Museum*, 398 NW2d at 152; *see* Hicks v. Brookings Mall, Inc., 353 NW2d 54, 56 (SD 1984); City of Sioux Falls v. Henry Carlson Co., Inc., 258 NW2d 676, 679 (SD 1977).

[¶26.] We recognize that the contract here was not intended by the parties to be the final agreement. However, a common arrangement is an agreement viewed as a preliminary contract with open terms. This sort of agreement "sets out most of the terms of the deal, and the parties agree to be bound by those terms. But they undertake to continue negotiating on other matters to reach agreement on some

terms that are left open but that will be contained in the ultimate agreement." 1 E. Allen Farnsworth, Farnsworth on Contracts § 3.8a, at 232 (3d ed 2004). "If, despite continued negotiation by both parties, no agreement is reached on those open terms so that there is no ultimate agreement, *the parties are bound by their original agreement. . . .*" *Id.* (emphasis in original). "The second stage is not necessary; it is merely considered desirable." Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 FSupp 491, 498 (SDNY 1987). Thus, the initial agreement "binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities." *Id.*

[¶27.]     All the essential terms were expressed in this agreement. It set the price, the down payment, the interest rate, the approximate closing date, the personal and real property to be sold, the governing law, and the earnest money deposit. The parties could have closed their deal with this contract. Therefore, we conclude that the circuit court erred in ruling that this agreement was merely an option to purchase.

## 2. Modification of the Agreement

[¶28.]     In one of its conclusions of law, the circuit court ruled that the terms of the document the parties signed "were altered by the parties but no modified agreement was ever signed." Ziegler Funeral Home argues that the agreement was not modified because "[t]here is no writing that signifies a modification of terms." Paragraph eight of the parties' contract states that "[a]ny amendments to this Agreement must be made in writing and signed by all of the parties hereto." On the other hand, Cicmanec contends that the terms of the agreement "were too uncertain

to enforce and the parties were still negotiating" on the material terms of the contract.

[¶29.]     Nonetheless, we have already concluded that the parties' written agreement was an enforceable contract.  Although some of the non-essential terms were still being negotiated, both parties were bound and obligated to perform under their original purchase agreement.  *See* Amdahl v. Lowe, 471 NW2d 770, 775 (SD 1991) (stating that the contract "evidences the parties' agreement on the essential terms").  Under the terms of the contract, amendments to the agreement were required to be in writing and signed.  There was no subsequent writing.  Therefore, the August 27 agreement continued in full force and effect.  *See* Farnsworth § 3.8a, at 232.

[¶30.]     Cicmanec contends that Isburg's departure constituted an amendment, requiring the parties to execute another contract.  The circuit court agreed, concluding that Isburg was "a necessary party to this action."  Yet, after Isburg's departure, Cicmanec continued to meet with Amber Ziegler and continued to negotiate through his attorney.  Moreover, he continued as the director of the Ziegler Funeral Home long after Isburg left.  Cicmanec cannot claim, on the one hand, that the agreement was unenforceable for lack of a necessary party, and then on the other hand, lead everyone to believe that he was entitled to the full benefit of the contract without Isburg.  After all, it was Cicmanec (and his partners) who wanted Isburg out of the deal.

[¶31.]     Cicmanec took full advantage of his contract position in taking over the directorship of the funeral home in anticipation of the purchase.  Even if the

contract could be deemed defective or incomplete, this conduct constitutes ratification. A contract is ratified when "an act by which an otherwise voidable and, as a result, invalid contract is conformed, and thereby made valid and enforceable." 17A CJS Contracts § 138 (1998). *See also* Restatement (Second) of Contracts § 380 cmt. a (1981) (Ratification by Affirmance). Ratification can either be "express or implied by conduct." Bank of Hoven v. Rausch, 382 NW2d 39, 41 (SD 1986) (citation omitted). "In addition, failure of a party to disaffirm a contract over a period of time may, by itself, ripen into a ratification, especially if rescission will result in prejudice to the other party." First State Bank of Sinai v. Hyland, 399 NW2d 894, 898 (SD 1987) (citations omitted). If Cicmanec previously held any right to withdraw from the agreement, his conduct of operating the funeral parlor as its director over an extended period effectively ratified the agreement.

[¶32.]     Cicmanec took over the funeral parlor as its director and operated it for more than a year. Although he later claimed that failure to obtain financing was his reason for not proceeding with the deal, the contract did not have financing as a contingency. In the meantime, believing that the purchase agreement was going to be performed, Amber Ziegler ended her search for another buyer. She also placed advertisements in the local newspaper to establish Cicmanec's standing in the community as the new owner of the funeral home. Cicmanec remained the funeral home's director well past the 90-day period and never notified Amber Ziegler that his "due diligence" revealed any problems with proceeding with the purchase. Thus, the contract was binding upon the parties.

### 3. Remedies

[¶33.] In another of its conclusions of law, the circuit court held that Ziegler Funeral Home (1) "did not establish any compensatory damages"; (2) "did not plead [or] prove specific performance"; and (3) "elected her remedy when she released Cicmanec as the funeral director" and informed him that the funeral home was no longer for sale.

[¶34.] The conclusion that compensatory damages were not proven is immaterial. What Ziegler Funeral Home sought all along was specific performance. Damages were only suggested as an alternative remedy. With regard to the failure to plead specific performance, the court's ruling is unsustainable. Under SDCL 15-6-54(c), "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings*." *Id.* (emphasis added); *see* Jensen v. Weyrens, 474 NW2d 261, 265 (SD 1991). And, besides, in the amended complaint, Ziegler Funeral Home did pray for "[a]ny other just and equitable relief as the Court sees fit." Under our procedural rules, "[a]ll pleadings shall be so construed as to do substantial justice." SDCL 15-6-8(f). The circuit court's conclusion that equitable relief was not available was error.

[¶35.] Equally untenable is the court's ruling on election of remedies. Only after Cicmanec breached the parties' agreement did Amber Ziegler proceed with the alternative of operating the funeral home on her own. She had no choice. Her duty was to mitigate damages stemming from Cicmanec's breach of contract. A choice to mitigate is not an election to forego remedies. "Those experiencing damage cannot

-14-

allow injury to continue and increase without expending reasonable effort to avoid further loss." Wasland v. Porter Auto & Marine, Inc., 1999 SD 134, ¶12, 600 NW2d 904, 907 (citing Davis v. Knippling, 1998 SD 31, ¶13, 576 NW2d 525, 529). *See also* O'Brien v. Isaacs, 116 NW2d 246, 249 (Wis 1962) (declaring that a plaintiff must do all that is reasonable to mitigate damages deriving from a breach of contract).

[¶36.]     We conclude that Cicmanec entered into a binding, enforceable contract, and because he breached this contract, Ziegler Funeral Home is entitled on remand to relief.

[¶37.]     Reversed and remanded.

[¶38.]     GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, concur.

[¶39.]     SABERS, Justice, deeming himself disqualified, did not participate.