#24286-rev&rem-TIEDE, Circuit Judge
**2007 SD 100**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE ESTATE OF BRUSTUEN H.
LIEN a/k/a BRUCE LIEN and
DEANNA B. LIEN,                           Plaintiffs and Appellees,

        v.

PETE LIEN & SONS, INC.,                   Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
\* \* \* \*

HONORABLE JOHN J. DELANEY, Sr.
Judge

\* \* \* \*

MITCHELL PETERSON and
ROBERTO A. LANGE of
Davenport, Evans, Hurwitz & Smith          Attorneys for plaintiffs
Sioux Falls, South Dakota                  and appellees.

LARRY M. VON WALD and
TED L. McBRIDE of
Beardsley, Jensen & Von Wald
Rapid City, South Dakota

JEFFREY G. HURD of
Bangs, McCullen, Butler,
 Foye & Simmons                            Attorneys for defendant
Rapid City, South Dakota                   and appellant.

\* \* \* \*

ARGUED ON
MAY 22, 2007

OPINION FILED 9/26/07

#24286

TIEDE, Circuit Judge

[¶1.]      This case involves the continuing conflict between Bruce Lien (Bruce) and Deanna Lien (Deanna) and Pete Lien & Sons, Inc. (PLS or corporation). We previously decided Lien v. Lien, 2004 SD 8, 674 NW2d 816 (*Lien I)*, in which Bruce brought an action against PLS and its directors alleging minority shareholder oppression, breach of fiduciary duty, and tortious interference with prospective business relations or expectancy and also sought dissolution based on shareholder deadlock. We held that dissolution and liquidation of the corporation's assets was not warranted and that Bruce had not established minority shareholder oppression or tortious interference. In this appeal, the trial court granted summary judgment in favor of Bruce finding that PLS breached a severance agreement with Bruce and a lease and option to purchase with Bruce and Deanna. PLS appeals. We reverse and remand.

## FACTS AND PROCEDURE

[¶2.]      The history of PLS is outlined in *Lien I.* PLS was founded in 1944 as a partnership with Bruce, his brother, Charles Lien (Chuck), and their father, Pete Lien, Sr., as the co-equal partners.[1] The business engages in the production of limestone aggregates, lime, sand and gravel, ready mix concrete, masonry block and steel fabrication, reinforcement and warehousing in the Rapid City, South Dakota area and several other states. It was incorporated in 1952 as a South Dakota corporation with the three partners as equal shareholders. Since inception the

---

1.      While this appeal was pending, Bruce Lien died on February 8, 2007. An order allowing the substitution of the Estate of Brustuen H. Lien, a/k/a Bruce Lien, was issued by this Court on June 26, 2007.

corporation has restricted the right of a shareholder to freely sell or transfer shares other than to another shareholder. Over the years, Pete Lien Sr. gifted and sold his stock to Bruce and Chuck. When their father died in 1969, Bruce and Chuck inherited the remainder of his stock and each became fifty percent shareholders of the corporation.

[¶3.]      Following our decision in *Lien I*, Bruce's relationship with his brother, Chuck, and PLS remained contentious. In August 2005 PLS became aware that Bruce's wife, Deanna, had been appointed Bruce's guardian and conservator. Until that time, Bruce had been paid as an employee of PLS, despite the fact that for several years he had not had any functions or duties associated with PLS. PLS claims that it was concerned about the possible liability of continuing Bruce's employment with PLS after he had been judicially declared incapable of handling his own affairs. The decision was made to terminate Bruce's employment. The PLS directors decided to provide Bruce a severance package which would continue his salary, bonuses and corporate perquisites until August 15, 2006.[2] This action was unilaterally taken by the Board and Bruce concedes in his brief that he accepted it without objection. According to an affidavit from Chuck, the directors were particularly concerned about their fiduciary duties to Bruce as a shareholder, especially in light of *Lien I*, and did not want to deprive Bruce of a return on his shares in PLS. According to Chuck, it was intended that before August 15, 2006, the newly appointed PLS dividend committee would adopt criteria for the directors'

---

2.      Bruce had been receiving salary and bonuses averaging nearly $1,000,000 annually.

declaration of dividends as a substitute for the salary, bonuses, and perquisites that had been provided to Bruce and Chuck over the years as a means of providing them with returns on their stock holdings.

[¶4.]      By a hand-delivered letter dated February 1, 2006, Deanna gave notice of her intent to sell all of the shares of PLS stock that she and Bruce owned[3] to Oldcastle Materials, Inc. (Oldcastle).  The notice was provided pursuant to Article VI of the PLS Amended Articles of Incorporation.  The notice stated in part:

> In my individual capacity and as guardian and conservator for Bruce H. Lien, I have entered into a Stock Purchase Agreement with Oldcastle Materials, Inc., dated as of January 31, 2006, a copy of which is attached for your reference.  The purchase price for the Shares is $35,250,000, *subject to the terms and conditions set forth in the Stock Purchase Agreement.*  The full amount of the purchase price consideration has been paid into an escrow account pursuant to the terms of the Agreement and the enclosed Escrow Agreement.

(emphasis added).  According to the Articles of Incorporation, the Board of Directors of PLS had ten days in which to exercise the option to purchase the shares for the corporation or on behalf of any shareholders.[4]

---

3.      Bruce and Chuck each owned 50 percent of the voting shares.  Chuck and members of his family together owned 50 percent of the non-voting shares.  Bruce owned the other 50 percent of the non-voting shares, except for one share transferred to Deanna in September 2004.

4.      On the same day that PLS was notified of the Stock Purchase Agreement, Chuck was contacted by a representative of Oldcastle who asked to meet him at the Rapid City Regional Airport.  The Oldcastle representative offered Chuck $45,000,000 for his PLS voting stock and the non-voting shares of Chuck and his family.  Chuck rejected the offer.

#24286

[¶5.]    The Stock Purchase Agreement provided that Oldcastle would pay the aggregate amount of $35,250,000 on the closing date, with the amount of $5,000,000 withheld from the Seller in an Escrow Account. This was identified as the "Deferred Amount" which was to be distributed to Bruce and Deanna if PLS's profits before interest, taxes, depreciation and amortization (PBITDA) was equal or greater than set forth below for the fiscal year ending December 31, 2006:

| Target PBITDA | Aggregate Amount of Deferred Amount Released to Seller |
|---|---|
| $16,000,000 | $5,000,000 |
| $15,000,000 | $3,000,000 |
| $14,000,000 | $1,000,000 |

Any remaining portion of the Deferred Amount would be returned to Oldcastle in accordance with the terms of the Escrow Agreement.[5]

[¶6.]    In the Stock Purchase Agreement under the heading of "Representations and Warranties of the Seller," Bruce and Deanna identified transactions by PLS with related parties, including the severance agreement with Bruce and a lease and option agreement between PLS, Bruce and Deanna relating to the PLS-owned house in which Bruce and Deanna lived. Under the heading of "Covenants of the Seller," the agreement provided:

> The Seller shall not pursue any claim or commence any Proceedings against the Company (a "Company Claim") without obtaining the prior written consent of the Buyer, such consent to be withheld in the Buyer's sole discretion. Upon the request of the Buyer, the Seller shall assign any Company Claim to the Buyer to the extent such

---

5.    A copy of the escrow agreement is not included in the record.

-4-

assignment is allowed under Applicable Law.  The Seller will cooperate with the Buyer with respect to any Company Claim.[6]

The agreement provided that it would be governed by the laws of the State of New York.  The agreement contained a release of liability by Bruce and Deanna.  Finally, the Stock Purchase Agreement contained a termination fee in the amount of $5,000,000 to be paid to Oldcastle in the event that the agreement was terminated for reasons other than as a result of a breach by Oldcastle.  Therefore, Oldcastle was to receive $5,000,000 from Bruce and Deanna if PLS exercised its right of first refusal and purchased the PLS stock owned by Bruce and Deanna.

[¶7.]          On February 6, 2006, PLS responded to the notice sent by Deanna with a document entitled "Exercise and Notice of Election on Right of First Refusal."  It provided in part:

> The purchase of the Seller's Shares by the Company shall be *subject to the terms set forth in the Stock Purchase Agreement* and the Oldcastle Escrow Agreements, which the Company agrees to be legally bound thereby to the same extent Oldcastle is legally bound thereunder.  The Purchase Price payable under the Stock Purchase Agreement shall be deposited in an escrow account with The Bank of New York and made available for disbursement to Seller on or before February 10, 2006, *subject to the terms of the Stock Purchase Agreement and the Oldcastle Escrow Agreement.*

(emphasis added).  On February 10, 2006, PLS deposited $35,250,000 with the Bank of New York as provided in the Escrow Agreement.  Bruce's and Deanna's shares were transferred to PLS.

---

6.          In this context, "Company" refers to PLS, not Oldcastle.

[¶8.] Following the transfer of stock, Pete Lien (Pete), President of PLS, notified Deanna on March 8, 2006, that the salary, bonuses and perquisites which otherwise would have been paid to Bruce under the severance agreement were discontinued effective February 11, 2006, the day following the sale of Bruce's PLS stock. By letter dated April 3, 2006, Deanna was notified that PLS was terminating her and Bruce's tenancy in the PLS-owned residence in which they resided. They were told to vacate the property on or before June 1, 2006.

[¶9.] Within approximately ten days of the April 3, 2006 letter, this litigation was commenced alleging breach of the lease and option agreement for the PLS-owned house and breach of the severance agreement. Agreeing that there were no material facts genuinely in dispute, both parties moved for summary judgment. PLS argued that it purchased Bruce's and Deanna's shares under the terms and conditions of the Stock Purchase Agreement with Oldcastle. It argued that the release, covenant not-to-sue and assignment of claims provisions of that agreement discharged PLS's obligations to Bruce and Deanna under the severance agreement and the lease and option. The trial court concluded that under PLS's Articles of Incorporation, Bruce and Deanna were entitled to receive the amount of money which Oldcastle had agreed to pay and the only consideration to which PLS was entitled in return was the stock in question. It concluded that the release and covenant not-to-sue did not relieve PLS of liability and that there was no legal basis for PLS to discontinue its severance package to Bruce prior to August 15, 2006. Further, the trial court concluded that the lease and option to purchase was a life-estate in favor of Bruce and Deanna until they consented to a lesser estate or to

termination of the life estate. It declared that the lease was not terminated and Bruce's and Deanna's option to purchase continued to be exercisable. It awarded Bruce and Deanna judgment in the sum of $456,316.46, which amount was stipulated to by the parties. PLS appeals.

## STANDARD OF REVIEW

> Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). We will affirm the trial court's grant or denial of a motion for summary judgment when no genuine issues of material fact exist, and the legal questions have been correctly decided. Titus v. Chapman, 2004 SD 106, ¶13, 687 NW2d 918, 923 (citing Holzer v. Dakota Speedway, 2000 SD 65, ¶8, 610 NW2d 787, 791 (citing Bego v. Gordon, 407 NW2d 801, 804, (SD 1987))). We review the circuit court's conclusions of law under the de novo standard. *Id.* (citing Sherburn v. Patterson Farms, Inc., 1999 SD 47, ¶4, 593 NW2d 414, 419 (citing City of Colton v. Schwebach, 1997 SD 4, ¶8, 557 NW2d 769, 771)).

A-G-E Corp. v. SD Dept. of Transportation, 2006 SD 66, ¶13, 719 NW2d 780, 785.

[¶10.]    "'On appeal, this Court can read a contract itself without any presumption in favor of the trial court's determination.'" *Id.* ¶15, 719 NW2d at 786 (citing Icehouse, Inc. v. Geissler, 2001 SD 134, ¶7, 636 NW2d 459, 462 (quoting Thunderstik Lodge, Inc. v. Reuer, 1998 SD 110, ¶12, 585 NW2d 819, 822)). "Cases involving the interpretation of written documents are particularly appropriate for disposition by summary judgment, such interpretation being a legal issue rather than a factual one." Kimball Investment Land, Ltd. v. Chmela, 2000 SD 6, ¶7, 604

NW2d 289, 292 (citing Dale v. Pelton, 365 NW2d 1, 3 (SD 1985); Wilson v. Great N.

Ry. Co., 157 NW2d 19, 21 (SD 1968)).

ISSUES AND ARGUMENTS

[¶11.]		**Whether the term "price" as used within the context of the right of first refusal included other consideration related to the terms forming Oldcastle's offer to purchase Bruce's and Deanna's shares in PLS.**

[¶12.]		The right of first refusal contained in PLS's Amended Articles of

Incorporation provides:

> *The stock of the Corporation* shall be subscribed for and issued on the condition that the same *shall not be sold* or transferred (other than to a stockholder of the Corporation) *without the holder thereof first giving written notice to the Board of Directors offering to sell the stock to the Corporation, or to the stockholders pro rata, at such price as he is able to obtain a bona fide offer therefore from any other party*, and said notice shall contain in addition to the price, the name and address of such prospective purchaser; thereupon the Board of Directors shall have a period of ten (10) days after receipt of said notice either to purchase the stock at said price on behalf of the Corporation or as the agent for any of the stockholders, and the holder shall, upon tender to him of the purchase price, transfer and assign the stock accordingly; and *in the event the offer is not accepted as aforesaid, the holder of such stock may sell the same (at any time within thirty (30) days thereafter) to the prospective purchaser on the terms specified in his offer and notice.*

(emphasis added).  A right of first refusal (ROFR) is a restriction on stock transfer.

McCroden v. Case, 1999 SD 146, ¶17, 602 NW2d 736, 741.  "Because restrictions on

the sale of stock are not generally favored, such restrictions must be strictly

construed."  *Id.* (citing United States v. Adkins-Phelps, Inc., 400 F2d 737, 740 (8th

Cir 1968); F.H.T., Inc. v. Feuerhelm, 320 NW2d 772, 777 (Neb 1982); *see also* Kerr

v. Porvenir Corp., 889 P2d 870, 872 (NMApp 1994)).

[¶13.] Bruce and Deanna claim there is a distinction between a ROFR that grants only the right to match the "price" and a ROFR that provides that it is subject to other "terms." They argue that the ROFR in this case uses the words "price" and "terms" differently. They claim that the "price" is simply the total amount of money that a prospective purchaser agrees to pay for the stock, whereas the word "terms" includes all of the other provisions of the prospective purchaser's offer, including non-monetary consideration to be received by the prospective purchaser in addition to the stock. Applying the language of the ROFR, they claim PLS had the right only to match the price of the Oldcastle offer, but not to receive or benefit from other terms of the offer.

[¶14.] PLS argues that the term "price" used in provisions relating to a ROFR does not simply mean "cash." It cites to a case from Delaware, *Union Oil Company of Calif. v. Mobil Pipeline Co.*, No.Civ.A. 19395-N, 2006 WL 3770834 (DelCh Dec. 15, 2006), in which the party which held a ROFR argued that because the ROFR did not require it to match "terms," it was only required to match "price," which it narrowly interpreted to mean "cash price." The Delaware Court of Chancery disagreed with this narrow interpretation:

> Unocal's argument ultimately has no firm support in the case law of this or any other jurisdiction, and is based on an overly simplistic reading of the term "price" that is not warranted in the context of a transaction between these sophisticated business entities. The absence of the word "terms" from the contract language is not material enough to warrant the extreme interpretation that Unocal asserts. That interpretation would prohibit a seller from negotiating a deal with a third party that involved any consideration other than cash. But among sophisticated business entities, the word "price" does not simply mean

"cash." "Price" is essentially equivalent to "consideration," and in the context of the ROFR, it simply refers to all of the material things that the seller will get in the deal - *i.e.*, all of the consideration-related terms.

*Id.* at *13. PLS also cites to McMillan v. Dooley, 144 SW3d 159, 176 (TexCtApp 2004), which found:

While "price" obviously includes an amount of money, the common and ordinary meaning of "price" does not exclude non-monetary forms of consideration. "Price" is defined in Black's Law Dictionary 1207 (7th ed 1999) as "[t]he amount of money *or other consideration* asked for or given in exchange for something else; the cost at which something is bought or sold."

(emphasis in original).

[¶15.] PLS also relies on Abraham Investment Co. v. Payne Ranch, Inc., 968 SW2d 518, 524-25 (TexCtApp 1998), which stated that "[p]referential rights of purchase have a generally well-understood meaning within the business world that the rightholder must be given an opportunity to purchase the property from the property owner on the terms offered by any third party." "Once the property owner conveys the terms of the offer to the rightholder, the rightholder then has the power to accept or reject the offer." *Id.* (citation omitted). "Thus, at the moment a property owner gives notice of his intent to sell, a preferential right 'ripens' into an option. The terms of that option are formed by the provisions granting the preferential right and by the provisions within the notice-of-intent-to-sell given to the rightholder. After the property owner has given his notice-of-intent-to-sell, he cannot change the terms of that offer as long as the option is binding upon the property owner." *Id.* (citations omitted).

[¶16.]    While Bruce and Deanna either criticize or distinguish the cases cited by PLS, they have not cited any case which specifically holds that the word "price" as used in a ROFR such as in this case, means only the cash to be paid and does not include any non-monetary consideration.  The problem with Bruce's and Deanna's narrow interpretation of the word "price" is that there are commonly non-monetary terms included in a purchase which are part of the consideration to be paid or received in the deal.  Those non-monetary consideration terms can affect the price which one party is willing to pay and another is willing to accept.

[¶17.]    The Stock Purchase Agreement between Bruce, Deanna, and Oldcastle is illustrative of the importance of these non-monetary terms in arriving at a negotiated price.  In that agreement, Oldcastle agreed to pay Bruce and Deanna $35,250,000 for the stock, but only upon condition that if the ROFR was not exercised by PLS and Oldcastle purchased the stock, Bruce and Deanna would upon request assign all of their Company Claims to Oldcastle.  Bruce and Deanna were also prohibited from suing on those Company Claims without the consent of Oldcastle.  It is clear from these provisions that Oldcastle was unwilling to have its fifty percent shareholder interest, for which it paid Bruce and Deanna $35,250,000, further reduced in value by giving to Bruce and Deanna the right to continue to collect from PLS or sue under the severance agreement; to continue to live in a $1,000,000 house on almost 160 acres of land rent free with an option to purchase at book value rather than fair market value or to sue under the lease and option; and, to collect on any promissory notes Bruce held from PLS.  If it was the intent of the parties that these provisions would survive the purchase by Oldcastle, then the

Stock Purchase Agreement would not have contained the assignment and covenant not to sue provisions and their absence would have manifested their intent that the price of $35,250,000 was intended to be exclusive of these other rights which Bruce and Deanna held at the time of the Stock Purchase Agreement.

[¶18.] The significance of these non-monetary terms to PLS is obvious. If they are not applicable, PLS has paid $35,250,000 for the right to continue to pay Bruce under the severance agreement; to permit Bruce and Deanna to continue to live rent free in a $1,000,000 house situated on almost 160 acres of land with an option to purchase at book value; and, PLS remains liable under the promissory notes held by Bruce. The "price" to PLS will be significantly greater than the price to Oldcastle.

[¶19.] "The interpretation of a contract is a question of law." Pauley v. Simonson, 2006 SD 73, ¶8, 720 NW2d 665, 667 (citing Ziegler Furniture and Funeral Home, Inc. v. Cicmanec, 2006 SD 6, ¶14, 709 NW2d 350, 354 (citations omitted)). "This Court looks 'to the language that the parties used in the contract to determine their intention.'" *Id.* ¶8, 720 NW2d at 667-68 (quoting *Ziegler,* 2006 SD 6, ¶16, 709 NW2d at 355 (other citation omitted)). "'If that intention is clearly manifested by the language of the [agreement], it is the duty of this [C]ourt to declare and enforce it.'" *Id.* (citations omitted) (alterations in original).

[¶20.] The ROFR as contained in the Amended Articles of Incorporation does not specify the "price" to be paid for the stock. It does require that before the stock can be sold or transferred other than to a stockholder of the corporation, the holder of the stock must first give written notice to the Board of Directors of the

corporation "offering to sell the stock to the Corporation, or to the stockholders pro rata, at such price as he is able to obtain a bona fide offer therefore from any other party." The ROFR thereafter provides, "in the event the offer is not accepted as aforesaid, the holder of such stock may sell the same . . . to the prospective purchaser *on the terms specified in his offer and notice*." The offer and notice referred to in this last clause of Article VI can only mean the offer and notice given by the holder of the stock (Bruce and Deanna) to the holder of the ROFR (PLS) on February 1, 2006. Under the plain language of the ROFR, if the offer was not accepted by PLS, Bruce and Deanna could only sell to Oldcastle on the same terms specified in their offer and notice to PLS. There is no dispute that Bruce and Deanna in their notice to PLS stated that they intended to sell their stock to Oldcastle not just for the "price" which they claim PLS is limited to under the ROFR, but also "subject to the terms and conditions set forth in the Stock Purchase Agreement." In other words, if PLS had elected to not exercise its option to purchase the stock under the ROFR, Bruce and Deanna could have sold their stock to Oldcastle but only on the terms specified in their offer and notice to PLS. The ROFR and the Stock Purchase Agreement make clear that Bruce, Deanna and Oldcastle did not deem themselves bound only by the price, but also by all of the terms specified in the Stock Purchase Agreement. It was the Stock Purchase Agreement which fixed the terms of the offer to PLS because those were the terms specified in their offer and notice to PLS and under which they would have sold to Oldcastle if PLS had not purchased the stock.

[¶21.]    As discussed earlier in our review of the relevant case law and as discussed above, we must, in addition to looking at the language of the ROFR, also look to the language of the notice of intent to sell to determine the offer made and accepted by the parties. The notice of intent to sell received from Deanna on behalf of herself and Bruce stated the "purchase price for the Shares is $35,250,000, *subject to the terms and conditions set forth in the Stock Purchase Agreement*." (emphasis added). This created an option which was formed by the "provisions granting the preferential right" (*i.e.*, the Articles of Incorporation), "and by the provisions within the notice-of-intent-to-sell given to the rightholders," (*i.e.*, the Stock Purchase Agreement) conveyed to PLS with Deanna's notice. *Abraham*, 968 SW2d at 524-25. In its exercise and notice of election of right of first refusal, PLS stated that it intended to exercise its right to purchase all of the shares "pursuant to the terms of the parties' Stock Purchase Agreement" and "related Escrow Agreement[.]" Bruce and Deanna agreed to these terms by accepting payment from PLS and transferring the stock.[7]

[¶22.]    Under the facts of this case, we must consider the ROFR, the notice of intent to sell and the Stock Purchase Agreement together. PLS was entitled to all

---

7.    We note that if Bruce and Deanna believed that PLS's acceptance subject to the terms and conditions of the Stock Purchase Agreement was not consistent with the terms of the ROFR, they could have refused to accept PLS's payment for the stock and proceeded with the Oldcastle purchase. They would have received the same cash consideration for their shares and would have avoided paying Oldcastle the $5,000,000 termination fee provided for in their agreement in the event PLS exercised its ROFR. Instead, they accepted PLS's payment of $35,250,000 into an escrow account as provided by the Stock Purchase Agreement and transferred the stock to PLS.

of the consideration which was part of the proposed sale to Oldcastle, including the non-monetary consideration. The Stock Purchase Agreement included an assignment of Bruce's and Deanna's "Company Claims" and a covenant not-to-sue that required Bruce and Deanna to obtain written consent before pursuing any claims against PLS. PLS performed all of its obligations under the Stock Purchase Agreement and is entitled to the same consideration that Oldcastle was to receive under the Stock Purchase Agreement.

[¶23.]     Even if PLS is entitled to all the terms and conditions of the Stock Purchase Agreement, Bruce and Deanna claim that the release, covenant not-to-sue, and assignment of claims provisions do not provide a defense for PLS because the claims in this litigation had not accrued at the time of the stock purchase. PLS acknowledges that the Stock Purchase Agreement did not extinguish or release any Company Claims that Bruce and Deanna might have had against PLS. Rather PLS argues that it vested control over those claims in the party acquiring the stock. It argues that this was part of the consideration to be received by the buyer. We agree.

[¶24.]     The Stock Purchase Agreement provides that it shall be governed by, construed and enforced in accordance with the laws of the State of New York. "We have generally recognized that parties may agree to be bound by the law of a particular state." Dunes Hospitality, L.L.C. v. Country Kitchen Intern., Inc., 2001 SD 36, ¶10, 623 NW2d 484, 488 (citation omitted). "Covenants not to sue, requiring that the obligor forbear from bringing any current or future claims against the obligee, are valid in New York." Kamfar v. New World Restaurant

Group, Inc., 347 FSupp2d 38, 50 (SDNY 2004) (other citation omitted). "A covenant

not to sue . . . is executory. The performance it demands is continuous and

prospective either permanently or for a limited, stated period of time. The

performance, of course, is the obligor's future forbearance in asserting a claim which

exists or *may accrue against the obligee."* Colton v. New York Hospital, 98 Misc2d

957, 965, 414 NYS2d 866, 873 (NYSupp 1979) (emphasis added).

[¶25.]       The Stock Purchase Agreement specifically provided:

> The Seller will not pursue any claim or commence any
> Proceeding against the Company (a "Company Claim")
> without obtaining the prior written consent of the Buyer,
> such consent to be withheld in the Buyer's sole discretion.
> Upon the request of the Buyer, the Seller shall assign any
> Company Claim to the Buyer to the extent such
> assignment is allowed under Applicable Law. The Seller
> will cooperate with the Buyer with respect to any
> Company Claim.

As part of the Stock Purchase Agreement, Bruce and Deanna agreed to not pursue

any claim or commence any proceeding against PLS without Oldcastle's consent.

Given the contentious history between Bruce and PLS, it was reasonable for

Oldcastle to wish to prevent Bruce and Deanna from being able to sue PLS after

Oldcastle purchased their shares. It is also reasonable to conclude that the

agreement not to sue and the assignment of Bruce's and Deanna's claims and

promissory notes were factors taken into consideration by the parties in reaching

the $35,250,000 purchase price. The severance agreement, lease/option to

purchase, and promissory notes at issue in this case were in existence at the time

the Stock Purchase Agreement was executed. They were specifically mentioned in

the agreement. Bruce and Deanna agreed in the Stock Purchase Agreement not to

pursue any claim or commence any proceeding against PLS without obtaining the prior written consent of the buyer. They also agreed to assign any claim against PLS to the buyer. As the buyer, PLS is entitled to the same consideration as Oldcastle would have received, including control over Bruce and Deanna's claims. Therefore, PLS is entitled to summary judgment on Bruce and Deanna's claims. We reverse and remand with direction to the trial court to enter judgment in favor of PLS.

[¶26.]    GILBERTSON, Chief Justice, and MEIERHENRY, Justice, and WILBUR, Circuit Judge, and MILLER, Retired Justice, concur.

[¶27.]    WILBUR, Circuit Judge, for SABERS, Justice, disqualified.

[¶28.]    TIEDE, Circuit Judge, for KONENKAMP, Justice, disqualified.

[¶29.]    MILLER, Retired Justice, for ZINTER, Justice, disqualified.