#25931-aff in pt, rev in pt & rem-SLZ

2011 S.D. 65

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CINDY TOLLE,                                    Plaintiff and Appellant,

    v.

PETER LEV,                                      Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WARREN G. JOHNSON
Judge

* * * *

PATRICK M. GINSBACH of
Farrell, Farrell & Ginsbach, PC
Hot Springs, South Dakota                       Attorneys for plaintiff
                                         and appellant.

TIMOTHY R. JOHNS of
Johns & Kosel, Prof. LLC
Lead, South Dakota                              Attorneys for defendant
                                         and appellee.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 22, 2011

OPINION FILED 09/28/11

#25931

ZINTER, Justice

[¶1.]          Cindy Tolle sued Peter Lev for damages for failing to transfer ownership of a cabin situated on land owned by the government in a national park. She also sued Lev for tortious interference with a business relationship she claimed with an employer.  The circuit court granted summary judgment on both claims. We affirm the dismissal of the tortious interference claim but reverse and remand on the claim for damages for failure to transfer the cabin.

*Facts and Procedural History*

[¶2.]          Tolle worked as a mountaineering guide at Exum Mountain Guides and School of Mountaineering, Inc. (Exum) in Wyoming.  Lev also worked for Exum as a guide, and he served on Exum's Board of Directors (Board).

[¶3.]          In 2000, Tolle agreed to sell real property in Lawrence County, South Dakota to Lev and Christine Coolidge.  During the preliminary discussions relating to this sale, Lev agreed to transfer ownership of his guide cabin to Tolle when Lev retired from Exum.  The cabin was a plywood structure located on land owned by the National Park Service in Grand Teton National Park.  Tolle claims that because of Lev's agreement to transfer the cabin, she reduced her sale price of the Lawrence County property by $25,000.

[¶4.]          A written purchase agreement dated May 18, 2000, was executed finalizing the Lawrence County sale.  According to the purchase agreement, Tolle agreed to sell the property to Coolidge and Lev as tenants in common for $131,590. The written agreement did not reflect how the sales price had been negotiated, and the agreement did not mention the oral statement that Lev would transfer the

-1-

guide cabin in Wyoming. Further, the purchase agreement contained an integration clause merging all prior negotiations and representations into the final written agreement. On August 17, 2000, Tolle signed a warranty deed conveying the property to Lev and Coolidge. The deed also made no mention of the cabin.

[¶5.]     In 2005, Lev sent Tolle an email confirming his agreement to transfer ownership of the cabin to Tolle. The email read:

> You are right to be bummed for me not (so far) indicating I would not [sic] keep up my end of the bargain about you getting my cabin as part of the land deal we had. . . . I did make that agreement with you. But I haven't left Exum yet. . . . As long as I was still at Exum I had no intention of giving up the place; you knew that.
> . . .
> P

When Lev retired from Exum in 2009,[1] Tolle learned that Lev had already sold the cabin to his niece for $1,000.

[¶6.]     Tolle apparently threatened litigation because on April 7, 2009, Lev sent an email to Jack Turner, President of the Exum Board, and Cyndi Hargis, Secretary of the Board, disclosing that Tolle was threatening litigation for the loss of the cabin. In the email, Lev also told Turner that Lev needed to know sale prices for similar guides' camp cabins.[2] Turner responded stating he would get back to

---

1.     Lev sold the last of his shares in January 2009 and resigned from the Board in July 2009.

2.     Lev's first April 7 email stated:

> Cindy Tolle is strong-arming me saying I owe her considerable money for the cabin (in addition to which I originally paid for her farm). She says the cabin is rightfully hers, and I had no right to sell it to Kim. This time she is serious. What I need to
>
> (continued . . .)

Lev on prices, but thought Lev did not owe Tolle anything because the cabins belonged to Exum.  Turner also wrote: "If there is something on paper, then you should copy it to us for our attorney to look at.  If Cindy [Tolle] gets too nasty, send her to me."  Lev responded twice, admitting there had been an agreement, adding more details about the cabin dispute, and stating that his plan was to have no further communication with Tolle, though he expected to be sued by her.[3]  Turner

_____

(. . . continued)
>know is what have been the various sale prices for guides camp
>cabins to date, as far as you know.
>. . .
>P

3.    Lev's first responsive email on April 7 stated:

>Thanks for your reply.  Unfortunately the present issue is that
>Cindy says she sold the farm to me and Chris at below normal
>price (that isn't true; I have the valuations from then) and I
>agreed to give her the cabin in exchange.  Double unfortunately,
>I did some years ago (2005) in an email (which she kept and just
>sent back to me) saying that I had told her when we purchased
>the farm in 1999 she could have the cabin when I left, but there
>was never as far as either me or Chris can remember a cost deal
>relating to the farm sale.  I may be screwed; that is why I
>wanted to know what the sale prices for the cabins have been.  A
>few years ago when this first came up I wrote her that she
>overcharged us for the two additional lots (according to local
>valuations) and therefore we didn't owe her anything, cabin or
>whatever.  She has just written me that the sale of those lots
>were our tough luck and I still owe her the cabin or money (she
>hasn't yet said how much).  I am also getting a lawyer.
>She is getting ugly.
>P

    Lev's second responsive email on April 8 stated:

>See below.  Tolle is reading what I said about the difference in
>the cost of the original farm property in 2000 backwards;  I paid
>her $25,000 more than what it was assessed at (I have the
>                                          (continued . . .)

replied on April 8, volunteering: "I will deal with Cindy [Tolle] this afternoon in a letter to the [B]oard. Cindy has been messing with Exum, the Exum board, and the Exum cabins for over a decade now, and I'm going to end it."

[¶7.] Later on April 8, Turner emailed the Board about Tolle's employment with Exum. Tolle's claim of employment with Exum started that year in February, when Exum sent letters inviting their guides to return for the upcoming season. Exum had not sent a letter to Tolle, who had guided for Exum in past seasons, so she contacted two members of the Board, Mark Newcomb and Nat Patridge. Newcomb responded on March 12 with an email telling Tolle that she should return to Exum and guide. Turner learned of the invitation and was concerned about Tolle's return. In his April 8 email to the Board, Turner disclosed several problems Tolle caused in the past and his concern about hiring her for the upcoming season. These concerns were unrelated to the cabin transfer issue. He asked the Board members to vote on whether to rescind the offer of employment to Tolle and not hire her in future years. The Board conducted a conference call on the matter. The Board, including Lev, unanimously voted to rescind the offer of employment.[4] Turner then sent Tolle a letter notifying her Exum was not going to employ her.

_____

(. . . continued)

> original assessment). My plan for moving forward is to not respond to this email, and have no further communication with her, ever. I expect her to sue me (or her lawyer husband).
> P

4. Lev admitted in his affidavit that he participated in the Board's conference call discussion, but stated that he "just listened" except for responding to two points: (1) he came to Tolle's defense regarding her guiding and safety skills, and (2) after a lengthy discussion at which time consensus about not

(continued . . .)

[¶8.]    Tolle subsequently commenced this action. In her first count, Tolle sought $25,000 from Lev under a theory of promissory estoppel for failing to transfer the cabin. Tolle claimed damages in the amount of $25,000 because that was the amount by which she claimed she reduced the price of the Lawrence County property in return for the agreement to transfer the cabin. In her second count, Tolle sought damages for tortious interference with her claimed business relationship (employment) with Exum.

[¶9.]    Lev moved for summary judgment arguing that Tolle's cabin claim was barred by the statute of frauds, the doctrine of merger, and the parol evidence rule. The court ruled that Tolle's claim was barred by the statute of frauds, specifically SDCL 53-8-2(1) and (3). Lev also moved for summary judgment on Tolle's tortious interference claim. The court ruled that "there [were] no genuine issues of material fact in the record to support one or more of the elements constituting [Tolle's] tortious interference with a contractual relationship claim." Tolle appeals both rulings.

*Decision*

[¶10.]    1.    *Whether the circuit court erred in granting summary judgment on Tolle's promissory estoppel claim.*

[¶11.]    "This Court reviews a grant of summary judgment 'to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment on the merits as a matter of law.'"

---

(. . . continued)

    employing Tolle was reached, he agreed to vote in response to Turner's request for unanimity because Lev had yet to speak up. Tolle did not refute this affidavit.

*Johnson v. Sellers*, 2011 S.D. 24, ¶ 11, 798 N.W.2d 690, 694 (quoting *DRD Enters., L.L.C. v. Flickema*, 2010 S.D. 88, ¶ 10, 791 N.W.2d 180, 183-84). "The circuit court's conclusions of law are reviewed de novo." *Id.* "All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party." *Gail M. Benson Living Trust v. Physicians Office Bldg., Inc.*, 2011 S.D. 30, ¶ 9, 800 N.W.2d 340, 342-43. Nevertheless, the party challenging summary judgment "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Schwaiger v. Mitchell Radiology Assocs., P.C.*, 2002 S.D. 97, ¶ 7, 652 N.W.2d 372, 376. "We will affirm the circuit court's ruling on a motion for summary judgment when any basis exists to support its ruling." *United Bldg. Centers v. Ochs*, 2010 S.D. 30, ¶ 10, 781 N.W.2d 79, 82.

*Statute of Frauds*

[¶12.]	The circuit court dismissed Tolle's cabin claim, relying on the statute of frauds, SDCL 53-8-2(1) and (3). Subsection (1) prohibits enforcement of an oral agreement "that by its terms is not to be performed within a year from the making thereof." Subsection (3) prohibits enforcement of an oral agreement "for sale of real estate." These types of oral agreements are "not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged." SDCL 53-8-2.

[¶13.]	Tolle argues that SDCL 53-8-2 does not bar her claim because Lev's 2005 email was a sufficient writing and because the cabin agreement was for the sale of personal property, not real estate. We agree with both contentions. The

2005 email was a written confirmation of the agreement subscribed by Lev[5] that satisfied the writing requirement in SDCL 53-8-2. Additionally, SDCL 53-8-2(3) is inapplicable because the agreement was for the sale of personal property. The record reflects that these cabins were routinely transferred for nominal sums among guides while working for Exum. The record also reflects that the transfers included no interest in real estate – the land was owned by the National Park Service and could not be sold by Lev.[6]

*Merger*

[¶14.] Lev argues that the doctrine of merger bars Tolle from claiming that Lev agreed to transfer the cabin as a part of the consideration for the Lawrence County property. Lev points out that the purchase agreement contained an integration clause, and neither the purchase agreement nor the warranty deed mentioned any obligation to transfer the cabin. The doctrine of merger provides: "[U]pon delivery and acceptance of an unambiguous deed, all prior negotiations and agreements are deemed merged within." *Estate of Fisher v. Fisher*, 2002 S.D. 62, ¶

---

5. "The writing requirement of the statute of frauds ensures reliable evidence is presented before a contract[ual] obligation is enforced against one of the parties to the contract." *Northstream Invs., Inc. v. 1804 Country Store Co.*, 2007 S.D. 93, ¶ 11, 739 N.W.2d 44, 48. "[T]he term 'subscribed' contained in SDCL 53-8-2 may include a typewritten name or other symbol of authentication where the party intends such act to be his or her signature on the document." *Id.* ¶ 14. Peter Lev does not dispute that he intended to sign the email by typewriting "P" at the end of the email.

6. Tolle also argues that the statute of frauds is not a defense where a party can prove promissory estoppel. *See Jacobson v. Gulbransen*, 2001 S.D. 33, ¶ 26, 623 N.W.2d 84, 90-91 (stating that an agreement is not subject to the statute of frauds when there is proof of promissory estoppel). In light of our ruling, we do not address this argument.

15, 645 N.W.2d 841, 846. Lev also points out that under the integration clause in the purchase agreement, the parties' written agreement became the complete and final statement of the parties' obligations.

[¶15.] Tolle argues that the collateral contract exception to the doctrine of merger applies.[7] There are two tests to determine if the collateral contract exception applies: "(1) whether the collateral contract forms an integral part of the principal purpose of the deed, namely conveyance of title and quantity of land, and (2) whether the parties intended the contract to be collateral." *Hammerquist v. Warburton*, 458 N.W.2d 773, 776 (S.D. 1990).

[¶16.] In this case, the principal purpose of the purchase agreement and deed was to convey title to Lawrence County real property. The oral agreement to transfer the cabin in the Grand Tetons involved personal property in Wyoming, making the cabin agreement a collateral contract unnecessary to convey title to the Lawrence County property. Additionally, the parties clearly intended the cabin agreement to be collateral to the Lawrence County sale because the cabin transfer was not to take place until Lev retired at some unknown point in the future. The cabin agreement and the Lawrence County property agreement also involved different parties. We conclude that the cabin agreement was a collateral contract, and neither the doctrine of merger nor the integration clause defeated Tolle's claim to enforce the oral agreement.

---

7. Tolle also argues that where the doctrine of promissory estoppel can be applied, merger cannot be used to defeat the claim. We do not address this argument because we conclude that the collateral contract exception applies.

*Parol Evidence*

[¶17.]        Lev argues that Tolle is attempting, by the admission of parol evidence, to vary the consideration term of the purchase agreement. The parol evidence rule, as codified in SDCL 53-8-5, provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." However, in this case, Tolle is not seeking to use Lev's oral statements to vary any term of the written agreement to sell the Lawrence County land. She is seeking to use the statements to prove a collateral oral agreement to transfer personal property. Moreover, Lev's emails were authored after the written purchase agreement and deed. The parol evidence rule does not bar conduct and discussions that occur after parties execute a contract. *Hofeldt v. Mehling*, 2003 S.D. 25, ¶ 11, 658 N.W.2d 783, 787.

[¶18.]        We reverse the circuit court's grant of summary judgment on Tolle's promissory estoppel claim regarding the cabin.

[¶19.]        2.        *Whether the circuit court erred in granting summary judgment on Tolle's claim for tortious interference with a business relationship.*

[¶20.]        The circuit court granted Lev's motion for summary judgment, concluding there were no genuine issues of material fact to support one or more of the elements of tortious interference. There are six elements a plaintiff must prove to sustain a claim of intentional interference with a business relationship: "(1) the existence of a valid contractual relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the

relationship, and (6) damages." *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.,* 2008 S.D. 89, ¶ 12, 756 N.W.2d 399, 406. Tolle carried the burden of proving each of these elements. *See id.*

[¶21.] Tolle argues that, in resisting summary judgment, she produced sufficient evidence to support a claim for tortious interference. Tolle alternatively claims that she introduced sufficient evidence to create genuine issues of fact for a trial on the elements necessary for tortious interference.

[¶22.] The party resisting summary judgment is required to "show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." *Lawrence Cnty. v. Miller,* 2010 S.D. 60, ¶ 14, 786 N.W.2d 360, 367. The resisting party cannot overcome a motion for summary judgment with mere general allegations and denials. *Id.* Lev argues that Tolle's showing in opposition of summary judgment involved nothing more than unsupported statements and speculation, which are not sufficient to create a genuine issue of material fact. *See id.* We hold that Tolle failed to meet her responsive burden of placing sufficient evidence in the record to support findings in her favor on element two (*intentional* interference) and element five (causation).

[¶23.] Tolle relies on the emails between Lev and Turner, and Turner's email to the Board to establish intentional interference and causation. But there is no indication in the record that Lev knew, at the time of his emails to Turner, that Tolle had been offered a guide position at Exum for the 2009 guiding season. Without such knowledge, Lev could not have intended his emails to Turner to

interfere with any prospective employment relationship Tolle may have had with Exum. Moreover, Lev's emails merely requested information about prior cabin sales and disclosed the nature of the dispute so he could collect evidence to defend against Tolle's impending suit. Lev made no mention of Tolle's employment, and there is no suggestion he requested Turner or the Board to do anything with respect to Tolle's employment. This record does not even create an inference that Lev's emails requesting historical cabin sale information were attempts to intentionally interfere with Tolle's employment relationship.

[¶24.] With respect to causation, we acknowledge that Lev did vote as a director on the decision to rescind the offer of employment. We also acknowledge that Turner made a passing reference to the cabin dispute in his email to the Board. But the record reflects that Turner's email and the Board discussion concerned numerous and substantial Tolle employment problems that were unrelated to the cabin. Moreover, Tolle did not contest the affidavits of Turner and Hargis indicating that the Board's decision had nothing to do with any dispute between Lev and Tolle. Tolle failed to identify any evidence, other than argument and speculation, even suggesting that Lev's emails were the legal cause of the Board's decision to rescind Exum's invitation to Tolle.

[¶25.] We affirm the circuit court's grant of summary judgment on Tolle's tortious interference claim.

[¶26.] GILBERTSON, Chief Justice, and KONENKAMP and SEVERSON, Justices, concur.

[¶27.] WILBUR, Justice, did not participate.