#28933-a-SRJ
**2020 S.D. 47**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE STATE OF SOUTH DAKOTA,
THE SOUTH DAKOTA PETROLEUM
RELEASE COMPENSATION FUND,                    Plaintiff and Appellant,

     v.

BP plc, BP AMERICA, INC.,
BP PRODUCTS NORTH AMERICA,
INC., BP WEST COAST PRODUCTS,
LLC and its predecessor companies and
subsidiaries,                                 Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICIA DEVANEY
Judge

* * * *

JUDITH K. ZEIGLER WEHRKAMP
Special-Appointed Assistant
   Attorney General
Harrisburg, South Dakota

MATTHEW J. HERMAN
ROBERT M. FOOTE of
Foote, Mielke, Chavez &
   O'Neil, LLC
Geneva, Illinois

* * * *

ARGUED ON
JANUARY 14, 2020
OPINION FILED **08/12/20**

MICHAEL L. MURPHY of
Bailey & Glasser LLP
Washington, D.C.                          Attorneys for plaintiff and
                                          appellant.


JEFFERY D. COLLINS
THOMAS G. FRITZ of
Lynn Jackson Shultz & Lebrun P.C.
Rapid City, South Dakota

DAVID ZOTT
MARTIN L. ROTH
DANIEL L. SIEGFRIED of
Kirkland & Ellis LLP
Chicago, Illinois                         Attorneys for defendants and
                                          appellees.

#29004

JENSEN, Justice

[¶1.]        The State of South Dakota and the South Dakota Petroleum Release Compensation Fund (Fund) sought to recover payments made to the predecessor and subsidiary companies of BP plc (hereafter jointly referred to as "BP") for the costs of cleaning up environmental contamination from underground petroleum storage tanks (UST) at 27 BP sites in South Dakota.[1]  The Fund also sought to recover payments made to third parties for cleanup costs at 19 other UST sites in South Dakota.  The Fund referred to these latter claims as "indirect claims," alleging that BP was responsible for cleanup costs because it had previously owned or operated the USTs at the 19 sites.

[¶2.]        The circuit court initially granted BP's motion for summary judgment on all but one of the 19 indirect claims, determining the claims were time-barred by the applicable statute of limitations.  Later, the circuit court granted BP's motion for summary judgment on the Fund's remaining claims against BP.  The Fund appeals, arguing that the circuit court erred in dismissing its claims.  The Fund also argues the circuit court abused its discretion in denying its motion for discovery sanctions.  We affirm.

**Facts and Procedural History**

[¶3.]        In 1988, the South Dakota Legislature created the Fund, administered by the Department of Environment and Natural Resources (DENR).  The Fund was

---

1.    The 27 UST sites were all previously owned by Amoco Corporation and its predecessor companies.  British Petroleum Company plc merged with Amoco Corporation in 1998 and became known as BP Amoco.  In 2000, BP Amoco's name was changed to BP plc.

designed to assist eligible UST owners and operators with environmental cleanup costs for spills or leaks of petroleum products from USTs. The Fund provides reimbursement of up to $1 million, less a $10,000 deductible, for cleanup costs at eligible UST sites. Revenue for the Fund is generated by a two-cent per gallon fee paid by bulk gasoline marketers and importers, such as BP.

[¶4.]     To receive reimbursement for environmental cleanup costs, a UST owner or operator must submit an application to the Fund, disclose any available insurance coverage for the contamination, and execute a subrogation assignment that transfers to the Fund the applicant's rights of action and claims which the applicant may have against any party, including insurers, who may be liable to indemnify any remediation costs at a UST site. The UST owner or operator must also certify that no settlement or release has been or will be made with any party responsible for the cleanup costs without the written consent of the Fund.

[¶5.]     Between 1990 and 2002, BP submitted applications and received approximately $3.1 million in total payments from the Fund for cleanup costs at 27 eligible UST sites in South Dakota. The contamination at the 27 sites was reported to have occurred between 1987 and 1998. The largest single reimbursement paid to BP for cleanup costs at any of the 27 sites was $677,800. The individual reimbursements at other sites were less than $500,000. BP's applications claimed there was no insurance coverage to indemnify the cleanup costs. BP also submitted letters with the applications representing it was self-insured for the UST contamination events for which BP sought reimbursement. In a 1992 cover letter forwarding an application to the Fund that sought reimbursement for seven sites,

BP stated the liability insurance "does not provide coverage for the referenced sites as, *inter alia*, remediation expenses do not exceed the [policy] deductible." The Fund reimbursed BP without further inquiry or investigation into possible insurance coverage.

[¶6.] Starting in the 1950s, BP purchased comprehensive general liability (CGL) insurance for liabilities arising from its operations. The CGL policies purchased by BP were high deductible plans. The earliest policies had a self-insured retention (SIR) of $500,000 per occurrence and provided no indemnity to BP for claims that did not exceed the SIR. In 1971, the SIR for BP's CGL policies was increased to $2.5 million per occurrence. In 1972, BP increased the SIR for its CGL policies to $5 million per occurrence and maintained the SIR at that level thereafter.

[¶7.] By at least 1973, the CGL polices purchased by BP also contained pollution exclusions for liability arising from gradual releases of pollutants. Coverage was only afforded under these exclusions if the occurrence was "sudden and accidental." In 1985, the CGL polices purchased by BP included "absolute" pollution exclusions that barred coverage for liability arising from any pollution claim, including UST cleanup costs. The policies also contained "owned property exclusions" that precluded coverage for damage due to an occurrence on BP's property, and limited liability coverage to property damage owned by third parties.

#29004

[¶8.]　　　　In the 1990s, London Market[2] and other CGL insurers became increasingly concerned about contingent liabilities under previously issued CGL policies for large-dollar environmental pollution claims at industrial sites, such as refineries. Insurers began filing coverage lawsuits against petroleum companies, such as BP, to quantify and reduce their exposure under these policies. In 1993, BP filed a lawsuit against London Market and other CGL insurers seeking a declaration of coverage for pollution costs at 23 large industrial sites, under CGL policies issued by the insurers to BP between 1959 and 1985. The estimated liabilities at each site ranged from $23 million to $220 million. None of the sites involved USTs or gas stations, nor were any of the sites located in South Dakota.

[¶9.]　　　　Several years after BP filed suit, BP and its insurers began settlement negotiations. To achieve finality, the insurers conditioned settlement of the 23 large-dollar claims on a buyback by the insurers of all estimated liabilities under the CGL insurance policies purchased by BP during this time. To facilitate these discussions, BP retained a team of consultants to prepare a Settlement Report to quantify BP's total environmental contamination exposure before absolute pollution exclusions were introduced into the CGL policies on June 1, 1985.

[¶10.]　　　　The Settlement Report primarily discussed the liabilities at the 23 industrial sites that were the subject of the litigation. The Settlement Report included a chapter discussing the potential environmental contamination at BP's gas stations, terminals, and bulk plants, which BP referred to as its "marketing

---

2.　　　London Market, also known as Lloyd's of London, acts as an intermediary between clients, brokers, underwriters and insurance syndicates to buy and sell insurance.

system." Because the cleanup costs for USTs at these sites generally did not exceed the SIRs in BP's policies, the report discussed a "single occurrence theory" in an effort to aggregate the cleanup costs for all USTs into a single occurrence. This theory posited that the single occurrence was BP's decision in 1917 to sell refined petroleum products at retail by storing and selling these products from company-owned above ground tanks and USTs. BP calculated the potential cleanup costs for thousands of retail outlets, over many decades, by estimating a per-station figure and multiplying it by the total number of BP gas stations, so that the total cleanup costs for USTs owned and operated by BP exceeded the SIRs. These calculations only included pollution at UST sites that occurred prior to the introduction of the absolute pollution exclusions in the CGL polices on June 1, 1985.

[¶11.]     The individuals involved in settlement negotiations testified that the insurers rejected BP's "single occurrence theory" for the USTs. However, between September 1997 and April 1998, BP entered into settlement agreements with the insurers for as much as $205 million for the 23 large-dollar industrial sites that were the subject of the litigation. The settlements were significantly less than the total cost of $2.7 billion calculated by BP to clean up these industrial sites. The settlement agreements provided that the payments did not include any amounts BP had received or might receive in the future from state or federal UST reimbursement funds.

[¶12.]     In 2010, the Fund filed suit against BP, seeking to recover $3.1 million previously paid by the Fund to BP for the cleanup costs at 27 UST sites in South Dakota. The Fund alleged that settlements between BP and its insurers were made

in violation of the Fund's subrogation rights and that BP engaged in fraud by failing to disclose the coverage lawsuits and settlements. The Fund alleged several theories of liability and rights to reimbursement from BP: Count I (violations of SDCL Ch. 34A-13 and ARSD 74:32:01, et. seq. for failure to disclose and misrepresentation of certain information required to be provided by statute); Count II (alleging statutory and other subrogation rights against settlement monies received from insurers); Count III (unjust enrichment); Count IV (fraudulent concealment and fraudulent misrepresentation); Count V (fraud).

[¶13.]      The Fund filed an amended complaint on July 7, 2015, alleging an additional claim for strict liability (Count VI). The Fund alleged in these "indirect claims" that it had reimbursed third parties for cleanup cost at 19 UST sites in South Dakota, and that BP was strictly liable for these costs under SDCL 34A-2-96 because BP had previously owned or operated the sites. Finally, in Count VII of the complaint, the State sought recovery of litigation costs pursuant to SDCL 34A-13-9.2.

[¶14.]      BP initially moved for summary judgment arguing that the Fund's claims were time-barred by the applicable statute of limitations. The circuit court entered an oral ruling on April 16, 2018, determining as to the indirect claims in Count VI, that the statute of limitations barred the Fund's claims for 18 of the 19 UST sites that were reported to the Fund prior to July 2, 2004. The circuit court concluded genuine issues of material fact existed concerning the timeliness of the action for one indirect claim, site 6197, and the claims for the 27 UST sites.

[¶15.] The Fund filed a motion for sanctions on March 16, 2018, alleging that a BP employee Tammy Brendel, who was designated by BP as a 30(b)(6) witness, had destroyed a document that contained a list of gas stations owned by BP in South Dakota where USTs were located, after a "litigation hold" had been placed on all such documents. The circuit court denied the Fund's motion for sanctions at a hearing on April 16, 2018, determining that the list was destroyed after the "litigation hold" was in place, but the destruction was unintentional. The court further found that BP had provided a complete list of USTs it had owned in South Dakota, and the court could not envision how the Fund had been prejudiced or harmed by the destruction of the list.

[¶16.] On July 27, 2018, BP moved for summary judgment on the remaining claims. BP argued as to Counts I through V that the State could not present a genuine issue of material fact showing that any of the CGL liability policies provided coverage for the cleanup costs at the 27 UST sites, or that BP received any settlement proceeds from insurers for these sites. BP also argued that summary judgment was appropriate for the indirect claim at site 6197 because there was no evidence showing that BP was statutorily responsible for cleanup costs at the site and the DENR had already determined that a party other than BP was responsible for the cleanup costs. The circuit court granted BP's motion for summary judgment on the remaining claims in a memorandum decision issued on January 23, 2019, determining that there was no insurance coverage or insurance proceeds received by BP to indemnify it for cleanup costs at the 27 sites.

[¶17.] The State appeals, raising several issues which we restate as follows:

1.     Whether the circuit court erred in granting summary judgment on the Fund's claims for recovery of monies paid to BP for cleanup costs at 27 UST sites.

2.     Whether the circuit court erred in granting summary judgment on the 19 indirect claims against BP.

3.     Whether the circuit court erred in denying the Fund's motion for sanctions.

## Standard of Review

[¶18.]     We review grants of summary judgment under the de novo standard of review. *Heitmann v. Am. Family Mut. Ins. Co.*, 2016 S.D. 51, ¶ 8, 883 N.W.2d 506, 508-09. "[W]e decide whether genuine issues of material fact exist and whether the law was correctly applied." *Id.* "We will affirm a circuit court's decision so long as there is a legal basis to support its decision." *Id.* "The interpretation of an insurance policy is a question of law, reviewed de novo." *Swenson v. Auto Owners Ins. Co.*, 2013 S.D. 38, ¶ 13, 831 N.W.2d 402, 407. Finally, a circuit court's decision on a motion for discovery sanctions is reviewed for an abuse of discretion. *Krueger v. Grinnell Mut. Reinsurance Co.*, 2018 S.D. 87, ¶ 12, 921 N.W.2d 689, 693.

## Analysis and Decision

1.     *Whether the circuit court erred in granting summary judgment on the Fund's claims for recovery of monies paid to BP for cleanup costs at 27 UST sites.*

[¶19.]     The Fund's subrogation claims, whether statutory, contractual, or equitable, involve a substitution of BP's rights under its CGL policies to the Fund. *See Schuldt v. State Farm Mut. Auto. Ins. Co.*, 89 S.D. 687, 690–91, 238 N.W.2d 270, 271–72 (1975). The Fund's statutory right of subrogation under SDCL 34A-13-9.2 is predicated on the availability of insurance coverage for environmental cleanup

costs, providing that "[t]he fund has the right to recover, under any pollution liability insurance contract available to a covered party . . . ." Moreover, "[A] subrogated insurer stands in [the] shoes of an insured, and has no greater rights than the insured, for one cannot acquire by subrogation what another, whose rights he or she claims, did not have." *Definition and Nature of Subrogation*, 16 Couch on Ins. § 222:5 (2020). Therefore, the Fund can only prevail on its subrogation claims if BP had a right of recovery, or actually recovered from the insurers for the cleanup costs at any of the 27 UST sites at issue.

[¶20.] Similarly, the Fund's other theories of liability seek damages *caused* by BP's alleged failure to disclose insurance coverage, or for receipt of insurance settlements to indemnify BP for cleanup costs at the 27 UST sites. *See N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'n Servs., Inc.*, 2008 S.D. 45, ¶ 8, 751 N.W.2d 710, 713 (a party alleging fraud must prove injury or damage caused by the fraudulent conduct); *Guthmiller v. Deloitte & Touche, LLP*, 2005 S.D. 77, ¶ 14, 699 N.W.2d 493, 498 (a party alleging breach of contract must prove an enforceable promise, a breach, and *resulting damages*); *Dowling Family P'ship v. Midland Farms*, 2015 S.D. 50, ¶ 19, 865 N.W.2d 854, 862 (unjust enrichment requires a showing that a party has accepted or acquiesced in benefits to which he or she is not entitled). Absent a showing that insurance coverage existed, or that BP has been indemnified under its CGL policies for cleanup costs at any of the 27 UST sites, the Fund cannot as a matter of law establish damages caused by BP's alleged wrongful conduct.

[¶21.]     The Fund claims that fact questions exist concerning the availability of insurance coverage under BP's CGL policies. The Fund frames the question as whether "there was insurance coverage, or the potential for coverage, based upon the law in 1993-1998 when [BP] sued its insurers and began negotiating a release of all claims despite previously subrogating such rights to [the Fund]." If there was potential for insurance coverage for the cleanup at any of the 27 UST sites, the Fund argues that questions of fact exist on whether the settlement proceeds received by BP from its insurers indemnified BP for these events. The Fund also claims it is BP's burden to establish the proceeds were not received for indemnification of these cleanup costs.

[¶22.]     "The interpretation of an insurance policy is a question of law." *Swenson*, 2013 S.D. 38, ¶ 13, 831 N.W.2d at 407. "The existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be construed according to the plain meaning of its terms." *W. Nat. Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 2016 S.D. 85, ¶ 8, 887 N.W.2d 887, 890. "[I]nsurance policies must be subject to a reasonable interpretation and not one that amounts to an absurdity." *Ass Kickin Ranch, LLC v. North Star Mut. Ins. Co.*, 2012 S.D. 73, ¶ 10, 822 N.W.2d 724, 727 (quoting *Prokop v. North Star Mut. Ins. Co.*, 457 N.W.2d 862, 864 (S.D. 1990)).

[¶23.]     As the non-moving party, the Fund has the burden under SDCL 15-6-56(c) to show that coverage existed under a CGL policy purchased by BP for cleanup costs at the 27 UST sites. However, the Fund has failed to identify any CGL policy

that would have indemnified BP for cleanup costs at any of these sites.[3] "Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nationwide Mut. Ins. Co. v. Barton Solvents Inc.*, 2014 S.D. 70, ¶ 10, 855 N.W.2d 145, 149 (citations omitted).

[¶24.] Further, the undisputed evidence in the record shows that the earliest CGL policies purchased by BP had a SIR of at least $500,000. By 1971, the SIRs for BP's liability policies increased to $2.5 million, and a year later the SIRs increased to $5 million for all BP-issued CGL policies. The circuit court correctly observed that the Fund had an "insurmountable math problem" as the earliest reported contamination at any of the 27 UST sites occurred in 1987, and none of the reimbursements paid by the Fund to BP came close to the $5 million SIR in place during the time of the reported contamination leaks.[4]

[¶25.] The Fund attempts to overcome the SIR hurdle by arguing that the single occurrence theory BP presented to its insurers during the earlier coverage litigation suggests the *possibility of coverage* under the CGL policies. However, the

---

3.  The Fund references Traveler's Insurance policies purchased by BP for three years in the 1970s that may have contained more favorable exclusions for environmental contamination. However, there is no evidence that any of the leaks or spills at these 27 UST sites occurred during policy periods, or that SIRs for these policies did not exceed the amount of any of these claims.

4.  The record reflects only one site where the reimbursement the Fund paid to BP exceeded $500,000, the lowest SIR for any CGL policy held by BP. However, the $500,000 SIRs existed prior to 1971. The UST contamination at this specific site was reported to have occurred in 1987, some 15 years after the $5 million SIR was in place in BP's policies. The Fund failed to present any competent evidence that the USTs at this site leaked prior to 1971.

Fund has failed to identify language in a CGL policy purchased by BP that would have permitted BP to aggregate the UST claims that occurred over several decades, at multiple locations, into a single occurrence.[5] Moreover, BP's single occurrence theory was presented only for UST contaminations that occurred prior to 1985, before the absolute pollution exclusions were in place. The Fund's reliance upon the single occurrence theory does not create a question of fact or law, as the record does not support either a possibility or actuality of coverage within BP's policies for any occurrences at the 27 UST sites.

[¶26.] The circuit court also discussed the pollution and owned property exclusions as alternative grounds for granting summary judgment on the question of whether insurance coverage was available to indemnify BP for cleanup costs at any of the 27 UST sites at issue. BP presents compelling arguments on appeal in support of affirming the circuit court's decision on these additional grounds. However, it is unnecessary to address these additional grounds because the Fund has failed to identify any BP CGL policies that would have indemnified BP for these events, and the record affirmatively demonstrates that BP was self-insured for these claims.

[¶27.] Finally, the Fund argues that the circuit court abused its discretion in concluding that evidence of settlement discussions and negotiations (Settlement

---

5.   For instance, one policy identified in the record describes an occurrence as "an accident or a happening or event or a continuous or repeated exposure [resulting] in personal injury, property damage . . . during the policy period. All such exposure to substantially the same general conditions *existing at or emanating from one premises location* shall be deemed one occurrence." (Emphasis added.) The policies referenced by the Fund's expert contain similar definitions of an "occurrence".

Evidence) between BP and its CGL insurers during the coverage litigation was inadmissible under SDCL 19-19-408. The Fund contends this evidence generates a question of fact whether BP received payment or indemnity for cleanup costs at the 27 UST sites.

[¶28.] The circuit court initially determined that the Settlement Evidence was inadmissible as an offer, compromise, or settlement under SDCL 19-19-408. Nonetheless, after determining the documents were inadmissible, the circuit court considered the Settlement Evidence to determine whether a genuine issue of material fact existed for summary judgment purposes. In ruling on the summary judgment motion, the court stated that it had reviewed and considered all the Settlement Evidence, including the "[s]ettlement Report and Demands, testimony of negotiators, related correspondence, and the Settlement agreements in considering the summary judgment motion." After doing so, the circuit court concluded that the Fund "failed to point to any specific facts from which it can be reasonably inferred that the settlement monies received by [BP] included value for the costs of cleanup from UST leaks at gas stations in general, much less at the 27 sites at issue here."

[¶29.] We review a circuit court's evidentiary rulings for abuse of discretion. *State v. Scott*, 2019 S.D. 25, ¶ 11, 927 N.W.2d 120, 125. "Not only must this Court find that the [circuit] court abused its discretion . . . , but it must find that the [judge's] consideration of the erroneously excluded evidence might and probably would have resulted in a different finding by the jury in order to warrant a reversal of the [circuit] court." *O'Day v. Nanton*, 2017 S.D. 90, ¶ 17, 905 N.W.2d 568, 572. Here, the Fund has failed to show prejudice from the circuit court's determination

under SDCL 19-19-408 because the circuit court did not exclude this evidence from its consideration in ruling on the motion for summary judgment. Further, the circuit court's disposition of the issue does not leave a justiciable controversy for this Court as to the evidentiary ruling. *See Franklin v. Forever Venture, Inc.*, 2005 S.D. 53, ¶ 10, 696 N.W.2d 545, 549. Therefore, we decline to consider the merits of the circuit court's evidentiary ruling under SDCL 19-19-408.

[¶30.] However, we conclude from our independent review of the evidence in the record, including the Settlement Evidence, that questions of fact do not exist as to whether the settlement proceeds received by BP in the coverage litigation included payment for the 27 UST sites in South Dakota. As discussed above, BP's CGL polices did not afford coverage for cleanup costs at the 27 sites. Further, the coverage litigation did not involve any USTs owned by BP and the insurance settlements paid only a fraction of BP's claims for the industrial sites at issue in the litigation. Although BP's Settlement Report included a discussion of a single occurrence theory for UST leaks at BP-owned sites, these were for sites where contamination was reported prior to 1985. The contamination at the 27 sites at issue were all reported in 1987 or later. Finally, the unrefuted testimony from insurers' negotiators in the coverage litigation shows that the insurers placed no settlement value on USTs or the single occurrence theory.[6] The Fund has failed to

---

6. Citing decisions from other courts, the Fund argues that BP is prohibited from allocating the settlement proceeds from its insurers to frustrate the Fund's subrogation rights. *Wright v. Aetna Life Ins. Co.*, 110 F.3d 762, 764 (11th Cir. 1997); *Dimick by Dimick v. Lewis*, 497 A.2d 1221, 1224 (N.H. 1985); *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 123 Cal. Rptr. 2d 256 (Cal. Ct. App. 2002). However, these decisions have no application in the context of this

(continued . . .)

"substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy." *Quinn v. Farmers Ins. Exchange*, 2014 S.D. 14, ¶ 20, 844 N.W.2d 619, 624–25.

[¶31.] The circuit court properly granted summary judgment on Counts I through V of the Fund's complaint seeking recovery for the 27 UST sites.

> 2. *Whether the circuit court erred in granting summary judgment on the 19 indirect claims against BP.*

[¶32.] The Fund commenced this action against BP on July 2, 2010. The Fund does not dispute that the indirect claims were subject to a six-year statute of limitations, or that the contamination at all the indirect sites, except site 6197, were reported to the Fund prior to July 2, 2004. Nevertheless, the Fund claims questions of fact exist as to the date the limitations period began to accrue.

[¶33.] The Fund argues the statute of limitations did not begin to run until it knew or should have known that BP was the actual party responsible for the contamination. It claims the date the limitations period began to accrue is a fact-bound question that can only be resolved at trial. BP responds that the statute of limitations began to run when the contamination at each site was reported and the Fund became aware of the UST leaks at each of these sites. We agree with BP. "[S]tatutes of limitations begin to run when plaintiffs first become aware of facts

---

(. . . continued)
case. Unlike the facts before us, the cited cases involve a discussion of subrogation rights where the subrogor had an actual legal right to collect monies that the subrogee had paid, and the subrogor had made a claim for such monies.

prompting a reasonably prudent person to seek information about the problem and its cause." *Gades v. Meyer Modernizing Co.*, 2015 S.D. 42, ¶ 9, 865 N.W.2d 155, 159.

[¶34.] There is no dispute that prior to July 2, 2004, the Fund was on notice that the USTs at 18 of the indirect sites had leaked and that it may have a claim against a responsible party for reimbursement of the cleanup costs. These facts were sufficient to start the six-year statute of limitations. The circuit court properly concluded that the Fund's indirect claims against BP at these 18 sites were time-barred by the six-year statute of limitations in SDCL 15-2-13.

[¶35.] The Fund also argues that the circuit court improperly granted summary judgment on the remaining indirect claim at site 6197. BP owned the gas station and four USTs at site 6197 until they were purchased in 1985 by Kertzman. Prior to 1985, Kertzman had operated the gas station since the 1960s under a lease with BP. After Kertzman's purchase, he removed the four USTs and installed three new USTs in 1986.

[¶36.] The circuit court determined BP had no responsibility for the cleanup costs at this site because BP owned the site prior to 1985, and there were no reported UST leaks at site 6197 until approximately 2004. The circuit court concluded that the undisputed facts showed BP was not a responsible party, and the Fund had failed to provide a legal or statutory basis to assert a claim against BP. The circuit court alternatively held that the DENR had determined Kertzman was the responsible party and the circuit court was without authority to overturn this decision because the administrative remedies had not been exhausted at the time.

[¶37.] The Fund claims questions of fact exist as to whether BP was a responsible party and points to its expert's statement in his report that the UST contamination at site 6197 may have occurred in 2004, or sometime before the installation of the new USTs in 1986. The Fund claims the circuit court improperly resolved this fact question on summary judgment.

[¶38.] The undisputed facts in this record show that there was no reported contamination in 1986 when Kertzman removed the USTs previously owned by BP and installed new USTs. It was not until 18 years later that soil contamination was first discovered and reported at site 6197. At that time, the DENR made the determination that the pipe above the three new USTs had leaked causing the soil contamination. There was no evidence that any other environmental contamination existed at the site. The DENR then determined that Kertzman was the responsible party. The Fund does not dispute any of this evidence. Instead, the Fund relies upon its expert report speculating that Kertzman may have installed new tanks in 1986 because the prior USTs owned by BP *may* have been leaking. This assumption by the Fund's expert is not supported by any evidence in the record. "The party resisting summary judgment is required to show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." *Tolle v. Lev*, 2011 S.D. 65, ¶ 22, 804 N.W.2d 440, 446 (internal quotation marks omitted). Evidence of expert speculation is insufficient to create a question of fact for a jury. *See Karst v. Shur-Co.*, 2016 S.D. 35, ¶ 20, 878 N.W.2d 604, 614-15. The Fund failed to present any competent evidence to show that the USTs at site 6197 leaked prior to 1985.

> 3.    *Whether the circuit court erred in denying the Fund's motion for sanctions.*

[¶39.]    The Fund claims the circuit court abused its discretion in failing to grant the motion for sanctions after Brendel improperly destroyed a 1990 document containing a list of UST sites owned by BP in South Dakota. The Fund served interrogatories and other discovery requests upon BP prior to 2015 requesting a complete list of USTs BP had ever owned in South Dakota. The purpose of the request was to determine whether there may be other indirect claims against BP for cleanup costs of USTs that the Fund had reimbursed to third parties. In response to this request, BP produced a list of 509 UST sites in South Dakota that BP had owned at some point in time.

[¶40.]    BP was unaware of the 1990 list held by Brendel and did not produce the specific list. Brendel testified that she received the list in 1990 when she began working for BP, and the list was a "snapshot" in time of 25 to 30 UST sites owned by BP in South Dakota. Brendel kept the list throughout the time she worked for BP, but it became obsolete as BP's records became electronic. Brendel testified she only kept the list because she was a "pack rat," even though she could have destroyed it years earlier under BP's records retention policy. Brendel also confirmed that the list of 509 sites that BP compiled during discovery included those 25 to 30 sites described in the 1990 document. While Brendel was aware of the "litigation hold" relating to the South Dakota litigation, she did not consider the list to be part of the litigation hold because all the pertinent records were electronic and had been produced.

[¶41.] Circuit courts have discretion in considering a motion for sanctions, as well as the appropriate sanction to impose. *Pearson v. O'Neal-Letcher*, 2007 S.D. 92, ¶ 10, 738 N.W.2d 914, 917. "SDCL 15-6-37 gives the trial judge broad latitude in penalizing the party who has failed to comply with discovery orders, however such latitude is not limitless." *Krueger v. Grinnell Mut. Reinsurance Co.*, 2018 S.D. 87, ¶ 12, 921 N.W.2d 689, 693-94. The record supports the circuit court's determination that BP fully responded to the discovery requests from the Fund and that BP had provided a complete list of all UST sites it had owned in South Dakota. Further, the circuit court appropriately recognized that even if the document's destruction may have been a possible violation of the discovery rules by BP, it was inadvertent and not designed to impede the Fund's access to discoverable information. The circuit court did not abuse its discretion in denying the motion for sanctions.

**Conclusion**

[¶42.] We affirm the circuit court's entry of summary judgment on Counts I through VI of the complaint seeking recovery for the 27 UST sites and 19 indirect sites. We also affirm the dismissal of Count VII seeking litigation costs under SDCL 34A-13-9.2 because the Fund was not entitled to recovery on any of its statutory claims. Finally, we affirm the circuit court's denial of the Fund's motion for sanctions.

[¶43.] GILBERTSON, Chief Justice, and KERN, and SALTER, Justices, and SABERS, Circuit Court Judge, concur.

[¶44.] SABERS, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.