#30813-r-PJD
**2025 S.D. 50**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

SOUTH DAKOTA BOARD OF
REGENTS, as the governing board for
DAKOTA STATE UNIVERSITY,                    Plaintiff and Appellee,

v.

MADISON HOUSING AND
REDEVELOPMENT COMMISSION,              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

JACOB D. DAWSON
WILSON KLEIBACKER of
Lammers, Kleibacker, Dawson
    & Miller, LLP
Madison, South Dakota                    Attorneys for defendant and
                                         appellant.


RICHARD L. ERICKSON
JOHN NELSON of
Nelson & Erickson Law Office,Prof. LLC
Madison, South Dakota                    Attorneys for plaintiff and
                                         appellee.

* * * *

CONSIDERED ON BRIEFS
JUNE 2, 2025
OPINION FILED **08/20/25**

#30813

DEVANEY, Justice

[¶1.]     Dakota State University (DSU), a state-operated post-secondary institution in Madison, operates under the authority and direction of the South Dakota Board of Regents.  In 2000, representatives from DSU sought to address increased demand for student housing and entered into negotiations with the Madison Housing and Redevelopment Commission (the Commission).  After extensive negotiations, the Commission agreed to construct and finance two eight-plex apartment buildings (the Property) and lease them to DSU, with DSU having an option to purchase.[1]  Through this arrangement, the Commission would obtain financing for the construction of the Property, with the debt to be serviced by the lease payments from DSU.  Prior to construction, and several times since, the parties executed written leases and DSU continuously leased the Property.

[¶2.]     In 2020, DSU notified the Commission of its intent to exercise the option to purchase.  The parties disagreed on the amount of the purchase price based on their differing interpretations of the buy-out language in the lease.  There was also a dispute regarding whether DSU was entitled to a set-off, or credit, with funds it alleged were to be kept by the Commission in a reserve account.  No such reserve account existed when DSU provided notice of its intent to exercise the option.

[¶3.]     DSU brought an action seeking a declaration of the parties' legal status and rights and alleging breach of contract, and the Commission

---

1.    The Commission also constructed and financed two four-plex apartment buildings.  These four-plex units are not the subject of the leases at issue in this appeal.

counterclaimed, seeking declaratory relief and alleging breach of contract. The parties filed cross-motions for partial summary judgment. The circuit court granted partial summary judgment in favor of DSU and denied the Commission's motion. After a court trial to determine the amount of the buy-out and related calculations, the court ruled in favor of DSU and entered a final judgment and order. The Commission appeals, challenging these rulings. We reverse and remand.

### Factual and Procedural Background

*2000 Lease*

[¶4.] On October 30, 2000, DSU and the Commission executed their first written lease agreement, which obligated the Commission to construct the Property and lease it to DSU. Relevant provisions include paragraph 2, which states in its entirety that "[t]he initial term of this lease shall commence on the 1st day of August, 2001, and shall continue thereafter for a period of ten (10) years. [DSU] may renew this lease for like term by providing [the Commission] sixty (60) days' written notice of its intention to do so." In paragraph 3, rent was set at $103,680 annually, to be paid in equal monthly installments starting August 1, 2001. This paragraph further stated:

> The annual rental amount is premised upon construction costs not in excess of [$1,272,000] to be financed at an interest rate of 6.25%. In the event that lower construction costs or lower interest rates would permit a lower annual payment, the difference between [$103,680] and the lower payment will be deposited in a reserve account. Monies in the reserve account will be disbursed to [DSU] (a) if it elects not to renew this lease as provided in paragraph 2, or (b) if it elects to exercise its option to purchase the leased premises as permitted in paragraph 16. . . . [[T]he Commission] will retain any earnings from the investment of any reserve funds.

[¶5.] Additionally, the lease provided that if DSU exercised "its right of renewal under paragraph 2, the rental rate will be adjusted to [sic] upon retirement of [the Commission's] obligations associated with the original construction financing. The new rental rate will reflect [the Commission's] actual costs associated with its ownership and administration of the facility."

[¶6.] DSU was given the option to purchase the Property, as set forth in paragraph 16 of the lease, which provided that "[DSU] shall have the option to purchase the leased premises at any time after the initial term of this lease for an amount equal to the then existing mortgage principal and interest balance, upon reasonable notice to [the Commission]."

[¶7.] The lease did not include language requiring the Commission to provide documentation or reporting of its actual construction costs for the Property, the terms of the financing it acquired for the construction, or any other information related to the Commission's financing of the Property; nor did it require reporting information regarding a reserve account, if any, created under paragraph 3.

[¶8.] The lease also contained terms regarding ongoing expenses. Specifically, DSU was responsible for taxes and insurance. The parties further agreed that DSU "shall, at its own expense, make all repairs, replacements, and maintenance to or upon the leased premises, and to pay all utilities and operational expenses whatsoever . . . Major building maintenance, that is not the result of the use by [DSU], is the responsibility of [the Commission]." Any permanent improvements to the premises requested by DSU, if agreed to by the Commission, would be made at the Commission's expense. It was acknowledged that this could

result in increased lease payments if agreed to by the parties before the improvements were made. Although not expressly stated in the lease, DSU alleged in its complaint that the reserve account referenced in the lease was to be used for maintenance and repair of the Property, with any amounts remaining in the fund to be paid or credited to DSU if it exercised the option to purchase. Both parties agreed, in their cross-motions for partial summary judgment, that any reserve account could be used for maintenance and repair.

*2011 Lease*

[¶9.]     DSU did not renew the lease for another ten-year term, as permitted by the 2000 Lease. Instead, prior to the expiration of the initial ten-year term, the parties negotiated a new lease that they signed in July 2011. The 2011 Lease did not refer to the 2000 Lease and was different in form and, in many respects, in substance compared to the 2000 Lease. Its term was changed to three years, from August 1, 2011 to July 31, 2014, "renewing automatically for successive two-year terms." Although the rental amount stayed the same, the language governing payment differed from the 2000 Lease. The payment paragraph stated in its entirety:

> 2. RENTAL PAYMENT: [DSU] shall pay an annual rent amount of $103,680, with equal monthly installments commencing on August 1st, 2011, and coming due on the first of each month thereafter.
>
> If [DSU] exercises its right of renewal, the rental rate will be adjusted to [sic] upon [the Commission's] obligations associated with the project. This adjustment will reflect [the Commission's] actual costs associated with its ownership and administration of the project.

#30813

[¶10.]     Unlike the 2000 Lease, the 2011 Lease did not contain language contemplating lower annual payments to service the debt in the event the Commission obtained a lower financing rate, or that any resulting difference between the lower amount and the $103,680 annual rental payment would be placed in a reserve account and disbursed upon DSU's exercise of the option to purchase. In fact, this lease had no language regarding a reserve account.

[¶11.]     With respect to an option to purchase, the 2011 Lease stated that DSU "shall have the option to purchase the leased premises at any time for an amount equal to the then existing mortgage principal and interest balance, upon reasonable notice to [the Commission]."

[¶12.]     Like the first lease, the 2011 Lease contained provisions relating to the Commission's obligation to pay for permanent improvements, which may result in increased lease payments. However, it also included new language providing more specificity regarding the parties' respective responsibilities for repairs, replacements, and maintenance, including several provisions in an addendum attached to the lease.

*2014 Lease*

[¶13.]     In July 2014, the parties signed a new lease that was similar to the 2011 Lease, although its term was for two years beginning August 1, 2014, and expiring July 31, 2016. It retained identical payment terms and language as in paragraph 2 of the 2011 Lease, and it included the same provision regarding DSU's option to purchase. It did not mention a reserve account. Changes from the 2011 Lease included removing the automatic renewal provision; adding language

requiring annual inspections by the Commission of the building systems and performing timely repair or replacement; and changing the provision regarding the timing of any lease termination notice by the Commission. This lease did not refer to the prior leases.

### 2017 Lease

[¶14.]    The next lease reflected in the record[2] was signed by the parties in May 2017, and was a three-year lease for the period from August 1, 2017, to July 31, 2020. It contained the same language as the 2014 Lease except the parties increased the amount of the annual rental payment for each year of the lease: year one was $135,000, year two was $146,000, and year three was $152,000, with the monthly payments adjusted accordingly. It also included the same language giving DSU the option to purchase the Property "for an amount equal to the then existing mortgage principal and interest balance, upon reasonable notice to [the Commission]." As with the 2011 and 2014 Leases, the 2017 Lease did not include a provision requiring a reserve account. The 2017 Lease did not refer to any of the prior leases.

### Notice of intent to exercise option to purchase and subsequent events

[¶15.]    As permitted under the 2017 Lease, on April 6, 2020, DSU gave the Commission written notice that it wished to purchase the Property and requested

---

2.    After the Commission filed its initial appellate brief, DSU filed a motion with this Court to supplement the record with a one-year lease executed by the parties in June and July of 2016 and covering the term from August 1, 2016 to July 31, 2017. Although DSU possessed this lease, it was not introduced below nor considered by the circuit court. We denied the motion to supplement the record and do not consider this lease in this appeal.

the pay-off amount of the "then existing mortgage principal and interest balance." A dispute arose between the parties over the purchase price based on their differing interpretations of the phrase "then existing mortgage," in light of the fact that the Commission had refinanced the original debt.[3] Also in dispute was whether DSU was entitled to an offset (credit) with funds it alleged were to be kept by the Commission in a reserve account, which was referenced in the 2000 Lease but not mentioned in subsequent leases, and whether the Commission had a continuing obligation after the 2000 Lease expired to maintain such a reserve account. No reserve account existed when DSU provided notice to exercise the option.

[¶16.] DSU continued to lease the Property as the parties attempted to resolve the dispute. In September 2020, the parties signed a lease addendum that stated, "WHEREAS, on or about the 30th day of October, 2000, [the Commission and DSU] entered into a Lease that was changed a number of times, including the last Lease dated August 1, 2017, a copy of which is attached hereto, marked as Exhibit 'A,' and incorporated herein by this reference[.]" The document contained additional "whereas" statements explaining that the parties were in the process of negotiating DSU's purchase of the Property and they desired to continue the lease while attempting to resolve the matter and "work toward a settlement[.]" The document then provided that the parties agreed DSU would continue to lease the

---

3.     According to evidence admitted at the court trial, the Commission's initial financing was through the issuance in 2000 of $1,800,000 in revenue bonds, amortized over 30 years with payments starting August 1, 2001. In May 2017, the Commission executed a conventional real estate mortgage and note with a local bank to refinance the outstanding balance of the revenue bonds ($1,172,922) and to provide capital for roof replacement and improvements to the Property and to the four-plex units. The note was for $1,300,000.

Property through December 31, 2020, stating the monthly amount due, and that "the terms of Exhibit 'A' shall remain in full force and effect." It also included this agreement: "The parties acknowledge that they are in the process of negotiating a settlement, and any statements made, whether set forth in this document or otherwise, shall not be used against the party making said statement in the event that the parties are not able to successfully negotiate a conclusion to this matter."

[¶17.] On January 29, 2021, the parties executed a second addendum containing identical provisions as the first addendum and extending the lease until May 7, 2021. Thereafter, DSU continued to lease the Property but without a written lease.

[¶18.] The parties failed to reach an agreement and on March 25, 2022, the Commission served DSU with a notice to quit requiring DSU to give up possession of the Property. On April 29, 2022, DSU filed the lawsuit at issue seeking a declaration of the parties' legal status and rights under the leases and a determination of the amount owed for the purchase of the Property. DSU's complaint also alleged breach of contract. The Commission filed its answer asserting various defenses and making its own counterclaims for declaratory relief, forcible entry and detainer, and breach of contract, alleging that DSU failed to pay for certain repairs and maintenance as required by the leases.

[¶19.] The parties conducted discovery, and thereafter filed cross-motions seeking partial summary judgment. In its motion and supporting documents, DSU contended that, over the lifetime of its leasing of the Property, it paid the Commission, via its lease payments, more than was necessary to service the original

debt. It claimed that any excess payments should have been held in a reserve account and the funds made available to DSU if and when it exercised the option to purchase. DSU argued that the Commission was obligated by the 2000 Lease to establish a reserve account and maintain it beyond the expiration of the initial ten-year lease. It further contended that the 2000 Lease and all subsequent leases memorialized a single, ongoing transaction, and that "each lease was a continuation of the original lease and all material terms were proliferated to each and every instrument." DSU asserted that the express terms in the 2000 Lease relating to the Commission's duties concerning the reserve fund were implied terms in all subsequent leases, and that the Commission's failure to maintain the reserve account constituted a breach of the implied duty of good faith and fair dealing.

[¶20.] Regarding the purchase price for the buy-out, DSU asked the court to rule that the "then existing mortgage" language in the option provision referred to the balance of the original construction financing contemplated in paragraph 3 of the 2000 Lease, and not any outstanding balance that included additional debt the Commission incurred when it later re-mortgaged the Property. Alternatively, DSU argued that if the court determined that the "then existing mortgage" language was ambiguous, it could consider extrinsic evidence to determine the parties' intentions.

[¶21.] In support of its motion for partial summary judgment, DSU filed affidavits and deposition testimony from several individuals, including a DSU employee and past or current board members of the Commission.[4] They provided

---

4.    DSU also included an affidavit prepared by a former law school professor and lawyer who offered his legal interpretation of the leases. In response, the

(continued . . .)

information regarding the discussions leading to the execution of the leases and, in some instances, their interpretations of the meaning of the phrase "then existing mortgage" contained in the buy-out provisions. The DSU employee also stated that DSU did not agree to the removal of the reserve account obligation and that the matter was never discussed.

[¶22.] The Commission filed a response to DSU's statement of undisputed material facts, as well as a cross-motion for partial summary judgment and supporting documents. With respect to the option to purchase provision in the 2017 Lease, the Commission argued that the plain and unambiguous meaning of the "then existing mortgage" provision related to "the actual amount of indebtedness secured by mortgage upon the [P]roperty at the time that DSU offers its intent to exercise the option." It noted that none of the leases contained language foreclosing the Commission from refinancing or increasing the indebtedness associated with the Property.

[¶23.] Additionally, the Commission argued that the leases were each separately bargained-for agreements, rather than one continuous transaction or contract. This was evidenced, according to the Commission, by the different terms contained in the 2011 and later leases compared to the 2000 Lease. It argued that

_____

(. . . continued)

Commission submitted a similar affidavit from an attorney not involved in the lawsuit. Affidavits in support of summary judgment motions that merely offer legal arguments, opinions, and conclusions need not be considered by the court. *See United States v. Coleman Cap. Corp.*, 295 F. Supp. 1016, 1020–21 (N.D. Ill. 1969), cited in *Maryland Cas. Co. v. Delzer*, 283 N.W.2d 244, 249 (S.D. 1979) (holding that an affidavit that merely argues the law may be disregarded). The circuit court did not refer to either of these affidavits in its rulings, nor do we.

there was no requirement to maintain a reserve account after the expiration of the 2000 Lease, and no provision existed in the 2017 Lease that would require such funds to be disbursed or credited to DSU for the purchase of the Property.

[¶24.]     In support of its motion, the Commission also relied on affidavits and deposition testimony, including the deposition of a former Commission board member, who indicated that he was on the board at the time the 2011 Lease was negotiated and signed.  He testified that the board had negotiated different terms in the 2011 Lease, and the changes were intentional.  He further testified that the reserve account provision was purposefully left out of the 2011 Lease.

[¶25.]     The circuit court held a hearing on the parties' cross-motions for partial summary judgment; a transcript of this hearing does not appear in the settled record.  On November 8, 2023, the court issued its memorandum decision on the motions, finding that DSU was entitled to partial summary judgment as a matter of law on its asserted interpretation of the relevant lease provisions and denying the Commission's cross-motion for partial summary judgment on the same legal issues.  The court ruled that the leases should be read together as a single transaction, determining that under this Court's precedent, it was not critical that the agreements were not executed at the same time, with the same terms.  It also relied, in part, on the language in the September 2020 addendum that referenced the 2000 and 2017 Leases.

[¶26.]     According to the court, because the leases represented one continuous transaction or contract, it concluded that the reserve account provision in the 2000 Lease was still in effect and, consequently, the Commission's responsibility to

maintain the account remained in effect. The court determined there was no genuine dispute as to the fact that the Commission has not performed its obligation and thus its failure to maintain the reserve account was a breach of its implied duty of good faith and fair dealing.

[¶27.] Finally, the court determined that the "then existing mortgage" language was not ambiguous, so it declined to consider extrinsic evidence to determine the meaning the parties intended. The court ruled that the phrase referred to the original financing that the Commission obtained as contemplated in the first lease, and not the refinanced mortgage. The court provided limited analysis of this issue, and its decision rested upon its view that the Commission's interpretation would mean that DSU "would be required to pay the entire balance of the refinanced mortgage, which includes the debt of multiple properties owned by [the Commission] rather than just the two eight-plex units that were contracted for." It viewed such an interpretation as "not reasonable" and one that leads to "an absurd result." The court subsequently entered its partial summary judgment order in favor of DSU and denied the Commission's cross-motion.

[¶28.] The Commission thereafter filed a motion for reconsideration. It asserted that comments in the court's memorandum decision indicate that the court misunderstood some of the evidence and arguments it had presented in response to questioning that had occurred at the motion hearing. Among other arguments, the Commission noted that it was apparent from the memorandum decision that the court believed the Commission's position was that DSU should pay "the balance on the mortgage securing the 'disputed property,' *as well as* any other property secured

by *the same* mortgage." The Commission denied that this was its position and emphasized that it did not expect DSU to pay for mortgage debt on any property that is not subject to the parties' contract. The next day, in an email to the parties, the court summarily denied the motion to reconsider without explanation.

[¶29.] A court trial was later held to determine the only issue remaining, i.e., the amount DSU would pay to purchase the Property as a result of exercising its option. This included calculating the remaining balance on the "then existing mortgage," as previously interpreted by the circuit court, and the amount of any credit or set-off attributable to a reserve account that the court ruled was required under the leases. After hearing testimony and the arguments of counsel, the court accepted DSU's calculations and its position that no additional amount was owed to the Commission and it was entitled to a refund. The court entered judgment for DSU in the amount of $23,310.79 and further ordered that title to the Property be transferred to DSU.

[¶30.] The Commission appeals from the circuit court's partial summary judgment and final judgment in favor of DSU. Although the Commission structures its arguments in terms of the denial of its motion for partial summary judgment and the granting of DSU's opposing motion, both rulings hinge on whether the circuit court correctly decided, as a matter of law, issues that we re-state as follows:

> 1. Whether the circuit court erred when it ruled that the terms of the 2000 Lease regarding the reserve account were still in effect when DSU exercised its option to purchase the Property.

2.    Whether the circuit court erred in its interpretation of the phrase "then existing mortgage" in the lease's buy-out provision.

3.    Whether the circuit court erred when determining the buy-out amount to purchase the Property.

**Standard of Review**

[¶31.]    "Contract interpretation is a question of law reviewable de novo." *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 2006 S.D. 6, ¶ 14, 709 N.W.2d 350, 354 (citation omitted).  Similarly, this Court reviews a circuit court's grant of summary judgment under the de novo standard.  *State v. BP plc*, 2020 S.D. 47, ¶ 18, 948 N.W.2d 45, 52 (citation omitted).  Where the parties have filed cross-motions for summary judgment and the material facts are undisputed, "this Court's review is limited to determining whether the circuit court correctly applied the law." *Buchholz v. Storsve*, 2007 S.D. 101, ¶ 7, 740 N.W.2d 107, 110 (cleaned up) (citation omitted).

**Analysis and Decision**

> ***1.    Whether the circuit court erred when it ruled that the terms of the 2000 Lease regarding the reserve account were still in effect when DSU exercised its option to purchase the Property.***

[¶32.]    When DSU sent notice of its intent to exercise its option to purchase in April 2020, the parties were operating under the 2017 Lease.  It is undisputed that the 2017 Lease does not have language regarding a reserve account, nor do any of the leases from 2011 forward.  The Commission contends that any obligation it had under the 2000 Lease to keep and maintain a reserve account does not exist in subsequent leases.  DSU asserts that the Commission was obligated throughout the

years to keep a reserve account and make its funds available to DSU when it exercised the option. As it argued below, DSU contends that all the leases should be read together as a single, continuous transaction and that the express terms regarding the reserve account in the 2000 Lease are implied in all subsequent leases.

[¶33.]      "Contracting parties are held to the terms of their agreement, and disputes cannot be resolved by adding words the parties left out." *Edgar v. Mills*, 2017 S.D. 7, ¶ 29, 892 N.W.2d 223, 231 (citation omitted); *see Coffey v. Coffey*, 2016 S.D. 96, ¶ 18, 888 N.W.2d 805, 812–13 (explaining that we "cannot add terms to the language of [an agreement] but rather 'are bound by the words chosen by the parties'" (citation omitted)). "This Court need only look to the language that the parties used in the contract to determine their intention. . . . If that intention is clearly manifested by the language of the agreement, it is the duty of this Court to declare and enforce it." *Ziegler Furniture & Funeral Home, Inc.*, 2006 S.D. 6, ¶ 16, 709 N.W.2d at 355 (cleaned up) (citation omitted).

### *Single, continuous contract*

[¶34.]      The circuit court determined that the absence of express terms regarding the reserve account in later leases is not dispositive because all the leases are to be read together as a single, continuous contract. On this basis, the court concluded that the obligations regarding the reserve account in the 2000 Lease still existed even after the lease expired. However, the cases cited by the court do not support this conclusion. The scenarios in cases in which we have found multiple

writings to constitute a single contract are far different than the scenario presented here.

[¶35.]     We have recognized that "all writings executed *as part of a single transaction* must be interpreted together." *Talley v. Talley*, 1997 S.D. 88, ¶ 22, 566 N.W.2d 846, 851 (interpreting as one contract a series of four contracts executed simultaneously by the same parties as part of a transaction to transfer interest in a ranch) (emphasis added); *see also Kramer v. William F. Murphy Self-Declaration of Tr.*, 2012 S.D. 53, ¶ 13, 816 N.W.2d 813, 815 (interpreting documents executed on the same day to transfer ownership of a pipeline as one contract; documents were attached, ordered sequentially, and *execution of one agreement was dependent upon the execution of other agreements*).  "[W]hen two or more instruments are executed at the same time by the same parties, for the same purpose and as part of the same transaction, the court must consider and construe the instruments as one contract." *GMS, Inc. v. Deadwood Soc. Club, Inc.*, 333 N.W.2d 442, 444 (S.D. 1983) (interpreting two separate documents as one contract where the same parties executed the documents simultaneously, as part of the same transaction for sale of property).

[¶36.]     Moreover, we have held that "[w]here several writings are connected by internal references to each other, even if they were executed on different dates and were not among all of the same parties, they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction." *Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D. 1990) (interpreting multiple documents executed as part of a change of ownership of business as one

contract, where the parties required them to be executed at the same time); *see also St. Paul Fire & Marine Ins. Co. v. Tennefos Const. Co.*, 396 F.2d 623, 628 (8th Cir. 1968) (holding that documents signed within months of each other, some of which expressly referred to each other, represented "successive steps . . . to accomplish a single purpose" related to a highway construction project).

[¶37.]     These decisions illustrate how the documents were significantly connected because they were dependent upon each other to effectuate a single, overarching transaction or purpose. But none of these decisions involved situations where a party was attempting to establish a relationship between documents executed *years* apart. Here, there was a span of 17 years between the 2000 and 2017 Leases, with separately executed leases in between. And other than the parties and the leased property being the same, the various leases were not executed for the purpose of a singular *transaction*, as reflected in our prior decisions. The purpose of each document was to lease the property for a separate and specific period; each lease stood on its own, expired on its own terms, and was not dependent upon the execution of another.

[¶38.]     In this case, the 2000 Lease—the only document containing the reserve account provision that DSU seeks to enforce—is not referenced in any of the later leases. In fact, the *only* documents that refer to the 2000 Lease were the 2020 and 2021 addenda, executed *after* the parties had disagreed about this very issue and were in the process of attempting to settle their dispute. As it did below, DSU relies on the fact that the addenda reference the 2000 and 2017 Leases to support its

argument that the documents should be read together. The circuit court also mentions these references in its decision.

[¶39.] However, the entire purpose of the addenda was to continue the *2017 Lease*—the most recent lease in effect and the only one that is specifically incorporated by reference in the addenda—while the parties negotiated a settlement of their dispute. When the addenda are read in context, the mere mention of the earlier existence of the long-expired 2000 Lease does not resurrect that lease nor incorporate all its terms into the later 2017 Lease. Moreover, the addenda include recitations that the parties were not "acknowledging or admitting any facts," and also contain the parties' express agreement that the statements contained therein "shall not be used against the party making said statement in the event that the parties are not able to successfully negotiate a conclusion to this matter." *See* SDCL 19-19-408 (a)(2) (a statement made during compromise negotiations about a claim is not admissible to prove or disprove the validity of a disputed claim). For these reasons, the circuit court should not have relied on this mention of the 2000 Lease in the addenda to support its interpretation that there was one continuing contract here.

[¶40.] DSU nevertheless argues that "each lease was a continuation of the original [2000] lease, and all material terms were proliferated to each and every instrument[.]" DSU's argument that the 2000 Lease and its terms—specifically, the provisions regarding the reserve account—continued beyond the July 2011 expiration of the lease and were maintained throughout the years is unavailing. DSU fails to address how a continuation of the 2000 Lease is reconcilable with the

-18-

existence of all the subsequent leases, some of which have conflicting or at least differing terms.

[¶41.]        For example, the 2000 Lease was for a term of ten years, with DSU having the right to renew "for like term," i.e., another ten years.  But that did not happen.  Instead, the term written into the 2011 Lease was only three years, with an automatic renewal provision for successive two-year terms.  Neither the 2014 Lease, which had a two-year term, nor the 2017 Lease, with its three-year term, contained an automatic renewal clause.

[¶42.]        Additionally, the language regarding the rental rate adjustment upon renewal is also different.  While the 2000 Lease states that if DSU exercised its right of renewal, the rental rate would be adjusted "upon retirement of [the Commission's] obligations associated with the original construction financing[,]" the 2011 Lease and those thereafter do not tie the adjustment of the rental rate upon renewal to the retirement of the Commission's obligations associated with the *original construction financing*.  Instead, they state that upon renewal, the rental rate would be adjusted to reflect "the [Commission's] obligations associated with the *project*."  (Emphasis added.)

[¶43.]        Further, all the leases after the 2000 Lease contain additional detailed language identifying and clarifying the parties' respective responsibilities for maintenance and repair.  They also contain several new provisions governing termination of the lease that were not present in the 2000 Lease.

[¶44.]        But the most striking difference, and particularly relevant to the issues in this case, are the changes to the rental payment paragraph.  While the

amount of rent stayed the same in 2011, most of the language that appeared in paragraph 3 of the 2000 Lease was eliminated and never re-appeared. There is no reference to the financing of the initial construction mortgage. And notably, none of the language regarding a reserve account, including any obligation to disburse funds from that account to DSU upon its exercise of the option to purchase, was included in the 2011 Lease or in any lease thereafter, including the 2017 Lease being interpreted here. The 2017 Lease is unambiguous in this regard, and this is the lease that the parties signed.

[¶45.]     DSU points to the fact that the option-to-purchase provision in paragraph 16 of the 2000 Lease stated that the option could only be exercised *after* the initial ten-year lease. DSU then suggests that this indicates the conditional obligation in paragraph 3 of that lease, requiring disbursement of funds from the reserve account if DSU exercises the option to purchase, survived the termination of the initial lease. But this argument ignores the fact that, regardless of what paragraph 3 of the 2000 Lease may have said, that version of the lease expired, as did the obligation to maintain a reserve account. Thus, starting with the 2011 Lease, that conditional obligation no longer existed going forward.

[¶46.]     It is apparent that, although the parties have maintained a leasing relationship over the years, it has existed by way of a series of written lease renewals with new terms and conditions, not a continuation of the original 2000 Lease. *See Jermar Properties, LLC v. Lamar Advert. Co.*, 2015 S.D. 26, ¶ 9, 864 N.W.2d 1, 4 (interpreting a lease and noting that a "renewal" is "[t]he re-creation of

a legal relationship or the replacement of an old contract with a new contract" (quoting *Black's Law Dictionary* (10th ed. 2014))).

[¶47.]    For all the foregoing reasons, we conclude that the circuit court erred in determining that the multiple leases constitute a single, continuous contract. As this was the basis for the court's determination that the Commission had an obligation to maintain a reserve account and disburse or credit such funds to DSU, we reverse the court's summary judgment determination in favor of DSU that these obligations continued after the expiration of the 2000 Lease. Instead, partial summary judgment should have been granted in the Commission's favor on this issue.

### 2.    Whether the circuit court erred in its interpretation of the phrase "then existing mortgage" in the lease's buy-out provision.

[¶48.]    Under a provision in the 2017 Lease, DSU had the option to purchase the Property "at any time for an amount equal to the then existing mortgage principal and interest balance[.]" The question for the Court is whether the circuit court properly interpreted that provision to mean that the buy-out amount is to be determined with reference to the financing the Commission initially obtained in 2000 to fund the construction of the Property, as DSU asserts. On the other hand, the Commission takes the position that the provision refers to "the balance owed on any mortgage on the subject property at the time DSU exercises its option to purchase."

[¶49.]    On appeal, the Commission argues that its position is supported by the plain language of the provision, which it contends is not ambiguous and should be

read literally. The Commission also argues that nothing in the lease prohibited the Commission from re-financing the original mortgage and the parties had ample opportunity to have included such restrictions in the various leases if that was intended. However, the Commission contends that if it is deemed necessary to evaluate the parties' intent behind the drafting of this provision, then extrinsic evidence would have to be considered on this disputed fact and summary judgment was not appropriate.

[¶50.] DSU argues that nothing in the leases contemplated that the Property could be remortgaged. DSU claims that all the circumstances surrounding the execution of the original lease and subsequent leases supports its interpretation. It argues the language in the buy-out provision in the leases, including the initial lease, "clearly refer to the mortgage financing the parties contemplated [that the Commission] would first secure during the ten-year term of the original lease" rather than any subsequent re-financing by the Commission.

[¶51.] "Generally, we have held that the parties' unambiguous agreement controls in subsequent disputes concerning their intent." *Sturzenbecher v. Sioux Cnty. Ranch, LLC*, 2025 S.D. 24, ¶ 21, 20 N.W.3d 419, 426. It is well understood that "[a] contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract. Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Ziegler Furniture & Funeral Home, Inc.*, 2006 S.D. 6, ¶ 16, 709 N.W.2d at 355 (alteration in original) (citation omitted); *see Ass*

*Kickin Ranch, LLC v. North Star Mut. Ins. Co.*, 2012 S.D. 73, ¶ 9, 822 N.W.2d 724, 727 (noting that "[t]he fact that the parties differ as to the contract's interpretation does not create an ambiguity" (citation omitted)). "If the contract is plain and unambiguous[,] 'extrinsic evidence is not considered because the intent of the parties can be derived from within the four corners of the contract.'" *Kernelburner, LLC v. MitchHart Mfg., Inc.*, 2009 S.D. 33, ¶ 7, 765 N.W.2d 740, 742 (alteration added) (citations omitted).

[¶52.]     The circuit court found that the language in the buy-out provision was not ambiguous, and the parties do not claim on appeal that it is. We agree. Therefore, we will interpret the provision on its face, without resorting to extrinsic evidence.

[¶53.]     In its memorandum decision, the court agreed with DSU's position that the language in the buy-out provision refers to the mortgage the Commission obtained at the onset of the construction, but the court did not explain why it believed this to be so, other than to say the Commission's interpretation would lead to an absurd result. In this regard, the court's ruling appeared to be colored by its impression that the Commission sought to require DSU to pay that portion of the existing refinanced mortgage attributable to the Commission's *other* properties as well. The Commission filed a motion for reconsideration to, in part, correct this premise, advising the court that the Commission "did not intend, and have not taken the position, that [DSU] ought to pay any mortgage debt on property which is not subject to this contract." Despite the Commission's clarification affecting the court's stated premise underlying its decision, the court did not alter its ruling.

[¶54.] But even if the Commission was improperly requesting more than what can be attributed to the "then existing mortgage" associated with only the eight-plexes, this would only constitute an absurd *application* of the contract language, and perhaps a breach of the contract terms. There is nothing inherently absurd about the contract term itself, i.e., that a buyer of property pay a price that would satisfy an existing debt associated with the property it is purchasing.

[¶55.] More importantly, the circuit court's interpretation of the phrase "then existing mortgage" is inconsistent with a plain and ordinary reading of the language the parties actually used. *Liebel v. Liebel*, 2024 S.D. 34, ¶ 17, 9 N.W.3d 505, 511 (noting that this Court will "examine the contract as a whole and give words their plain and ordinary meaning" (citation omitted)). Here, the parties' intentions are clearly manifested by the language they agreed to in this provision. Thus, we are obligated "to declare and enforce it." *Ziegler Furniture & Funeral Home, Inc.*, 2006 S.D. 6, ¶ 16, 709 N.W.2d at 355 (citation omitted).

[¶56.] The buy-out provision is clear and unambiguous. It refers to the "then existing" mortgage at a point in the future, sometime after the execution of the lease ("at any time"), when DSU elects to exercise the option. It contains no limiting language, nor did it refer to the initial construction mortgage from 2000 or the original financing terms. If the parties had wanted to include that language, they could have done so. It is well-established that "we will not rewrite the parties' contract or add to its language." *Edgar*, 2017 S.D. 7, ¶ 29, 892 N.W.2d at 231. We conclude that the circuit court erred in its interpretation of the "then existing mortgage" provision. Instead, the buy-out price must be calculated with reference

to the balance of the re-financed mortgage associated with the Property at the time of DSU's exercise of the option to purchase. As such, the court should have granted partial summary judgment in favor of the Commission instead of DSU on this issue.

### 3. Whether the circuit court erred when determining the buy-out amount to purchase the Property.

[¶57.] The circuit court's determination of the option buy-out price was based on what we have concluded to be an erroneous interpretation of the governing lease. Therefore, we also reverse the court's determination in this regard.

## Conclusion

[¶58.] We reverse the court's entry of partial summary judgment in favor of DSU on the above two issues relating to the reserve account and buy-out provision, and vacate the final judgment and order entered by the court. We remand for further proceedings consistent with this opinion, including the entry of partial summary judgment in favor of the Commission on the first two issues.

[¶59.] JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.